Jennifer **GERMAN** and Wellington German, infants by their Mother and Natural Guardian Ana Maritza German, and Ana Maritza German, Individually, Plaintiffs,

v.

**FEDERAL HOME LOAN MORTGAGE CORP.**, Property Services Company, CAISI Management Company, Inc., 1710 Montgomery Realty Assoc., L.P., and Jerome Deutsch, Defendants.

No. 93 Civ. 6941 (RWS).

United States District Court,
S.D. New York.

May 8, 1995.

---

Fitzgerald & Fitzgerald, P.C. by Brian Farrell, John E. Fitzgerald, of counsel, Yonkers, NY, and Bronx Legal Services by Lucy Billings, New York City, for plaintiff.

Siff Rosen, P.C. by William G. Ballaine, Thomas G. Merrill, of counsel, New York City, for defendants Federal Home Loan Mortg. Corp. and CAISI Management Co., Inc. and Harold Beck d/b/a Tebec Management Co.

Wilson, Elser, Moskowitz, Edelman & Dicker by Paul J. Bottari, of counsel, New York City, for New York City Housing Authority.

Weinstein, Chayt & Chase, P.C. by Irwin J. Weinstein, Matthew W. Daus, of counsel, Brooklyn, NY, for defendants 1710 Montgomery Realty Assoc., P.C., Property Services Co., Wittenstein, Wagman and Deutsch.

Paul A. Crotty by Gabriel Taussig, Lisa S.J. Yee, Steven Levi, Terri Feinstein Sasanow, of counsel, Corp. Counsel of City of New York, New York City, for defendant City of New York.

## OPINION

SWEET, District Judge.

Plaintiffs have moved for class certification pursuant to Rule 23, Fed.R.Civ.P. Defendants have moved for dismissal and summary judgment on various grounds. For the reasons set forth below, plaintiffs' motion is granted as modified, Defendants' motions are granted in part and denied in part as set forth below.

### The Parties

Plaintiff Jennifer German has resided at 1710 Montgomery Avenue (the "Montgomery Building"), Apartment 2H, Bronx, New York ("Apartment 2H"), since her birth in 1991. Her mother was informed that she was lead poisoned on December 9, 1992.

Plaintiff Wellington German has resided in the Montgomery Building, Apartment 2H since 1988. He was diagnosed with a blood lead level of 12 ug on or before October 22, 1992. Wellington was born in September 1988.

Plaintiff Ana Maritza German (together with Jennifer and Wellington German, the "Germans"), is the mother and natural guardian of Jennifer and Wellington German. She has resided in the Montgomery Building, Apartment 2H, since 1988.

Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac"), is a privately-owned corporate instrumentality of the United States chartered by Congress to increase the supply of money that primary mortgage lenders can make available to home buyers. See 12 U.S.C. §§ 1451–1459. Freddie Mac fulfills its mission by purchasing mortgages from financial institutions covering residential dwellings located throughout the United States. 12 U.S.C. § 1454(a)(1). Freddie Mac allegedly was the owner of the Montgomery Building from December 1988 until October 31, 1991, and from May 8, 1992, until September 16, 1992.

Defendant City of New York (the "City") owned and operated the Montgomery Building from October 31, 1991, until May 8, 1992. In addition, the City receives and administers federal funds to operate buildings under section 8 (42 U.S.C. § 1437f) and the Community Development Block Grant ("CDBG") program (42 U.S.C. § 5301). The complaint alleges that the City, as a Public Housing Authority ("PHA") used federal funds in the German home to repair and rehabilitate as part of a Community Development Block grant program and thus is obligated to comply with the Lead Paint Poisoning Prevention Act (the "LPPPA") and related federal regulations.

Defendant 1710 Montgomery Realty Associates, L.P. ("1710") and partners Todd Wittenstein ("Wittenstein"), Alex Wagman ("Wagman"), and Jerome Deutsch ("Deutsch") allegedly have owned the Montgomery Building from September 16, 1992,

until the present. 1710 has its principal office in Valley Stream, New York. Wittenstein and Deutsch reside in the City of New York. Wagman resides in Valley Stream, New York.

Defendant CAISI Management Company ("CAISI") was retained as managing agent of the Montgomery Building between December 1, 1988 and October 31, 1991, and between May 8, 1992 and September 16, 1992. CAISI has its principal place of business in Melville, New York.

Defendant Harold Beck d/b/a Tebec Management Co. ("Tebec") was retained as managing agent of the Montgomery Building from January 1, 1990, to December 31, 1990.

Defendant Property Services Company ("PSC") has been the managing agent for the Montgomery Building from September 16, 1992, until the present. PSC is a domestic corporation with its principal place of business in Valley Stream, New York. 1710, Wittenstein, Wagman, Deutsch and PSC are collectively known as the "1710 defendants."

Plaintiff Marcus Coran was born on October 8, 1990, and has resided at 1061 St. Nicholas Avenue (the "St. Nicholas Building"), Apartment # 5, New York, New York, since March 10, 1994. The building was allegedly built before 1960 and has peeling, scaling and cracked paint. The complaint alleges that the apartment contains paint on other chewable and lead dust generated surfaces that have been found to contain excessive levels of lead in violation of federal and local laws.

Plaintiff Raniqua Smith was born on January 3, 1991, and has resided at the St. Nicholas Building, Apartment # 5, New York, New York since March 10, 1994. Plaintiffs claim that Marcus and Raniqua have been diagnosed with at least slightly elevated blood levels. Marcus' blood lead level was measured at 12 ug/dL.

Plaintiff Denise Goffin (together with Marcus Coran and Raniqua Smith, the "Goffins"), is the mother and natural guardian of Marcus and Raniqua. She has resided in the St. Nicholas Building, Apartment 2H, since 1988.

Defendant Freddie Mac allegedly owns the St. Nicholas Building, receives and uses federal Section 8 [1] funds for the property.

Defendant NYCHA receives and administers federal Section 8 funds for residential property defendant Freddie Mac owns and operates.

### Prior Proceedings

Pursuant to a Summons with Notice and Verified Complaint dated July 26, 1993, the Germans instituted an action in Supreme Court, Bronx County, against PSC, CAISI, 1710, Freddie Mac, Deutsch, Wittenstein, and Wagman. The complaint sought damages for personal injuries to the infant Germans and sought relief for Ana German in her individual capacity as mother and natural guardian of the infant plaintiffs.

Pursuant to 28 U.S.C. § 1446(b), Freddie Mac, as an entity created by federal legislation, removed this action to this Court on October 5, 1993.

Argument was heard on a motion to amend the complaint on May 11, 1994. An opinion on that motion was issued on June 28, 1994, granting the plaintiffs right to amend their complaint to include additional defendants and to supplement their claims. *See German v. Federal Home Mortgage Corporation*, 1994 WL 319154 (S.D.N.Y.).

On August 17, 1994, this Court denied the Goffin plaintiffs' request for an order blocking the sale of the building,[2] (Proceedings, Aug. 17, 1994, at 20) and on August 22, 1994 the Goffins filed an intervening complaint in this action which sought individual and class relief.

1. Section 8 provides subsidies to private landlords. *See Housing and Community Development Act of 1974* ("HCDA"), 42 U.S.C. § 1437f (1988 & Supp IV 1992). Under the Section 8 program, qualifying tenants pay a portion of their income to the landlord. 42 U.S.C. § 1437a(a) (1988 & Supp. IV 1992). To raise these payments to market level rents, Section 8 authorizes the PHA to make "assistance payments" to the landlords

by using federal funds made available by contract with the United States Department of Housing and Urban Development ("HUD"). 42 U.S.C. § 1437f(b), (c), and (o). *See Comer v. Cisneros*, 37 F.3d 775, 781 (2d Cir.1994).

2. Freddie Mac sold the St. Nicholas building on September 1, 1994.

As of September 1, 1994 Freddie Mac had sold the St. Nicholas Ave. property. As of November, 1994 none of the defendants owned the building.

A Second Amended Complaint (the "Complaint") was filed on September 14, 1994 in which the plaintiffs sought class certification and an order requiring defendants to take steps necessary to protect their tenants from lead poisoning.

In general, plaintiffs allege that none of the defendants ever notified any of the plaintiffs of the hazards of lead in their residences, nor did defendants maintain the premises so as to reduce or eliminate the lead hazard in the residence. Among the steps not undertaken by the defendants were inspection, maintenance and repair. Specifically, the plaintiffs allege that the defendants did not cover up, seal, and eliminate the lead paint or dust and otherwise prevent plaintiffs' exposure to lead. *See* Complaint at ¶ 37.

Plaintiffs claim that their need for injunctive relief stems from the fact that they are being directly harmed by the immediately hazardous lead paint in their homes and that as a result of their continued exposure to lead paint, plaintiffs need the relief to ensure that the children are not now and will not become lead poisoned.

Specifically they seek an order requiring the defendants to: 1) notify their tenants regarding the lead hazards in defendants' buildings, 2) to take the steps necessary to minimize the harmful effects of lead to the tenants, 3) to create a fund, paid for by defendants, to provide medical surveillance and monitoring of the children in these buildings, 4) to refrain from evicting tenants and withholding security deposits, and 5) to abate the lead hazards in the buildings.

The complaint also states twenty causes of action and seeks damages and injunctive re-lief. The causes of action include: 1 and 2)[3] negligence; 3 and 4) negligence *per se* for violation of New York City Administrative Code §§ 27–2013(h) & 27–2126, 24 R.C.N.Y. § 173.13 and § 173.14 and 24 C.F.R. Part 35 and Part 570 (claim against NYCHA and NYC does not include § 173.13 and is Part 882, not § 171.13); 5 and 6) breach of contract and implied warranty of habitability; 7 and 8) products liability for selling a product defendants knew was inherently dangerous and for which they should be held strictly liable; 9 and 10) strict liability for ultrahazardous substances; 11 and 12) nuisance and absolute nuisance for failure to inspect, warn or take action to prevent further poisoning after being informed of German plaintiffs' poisoning (including damages); 13 and 14) intentional infliction of mental distress in buildings where lead exposure is noticed and uncorrected; 15 and 16) negligent infliction of mental distress on the children and their parents; 17) violation of federal law by the City of New York; and 18) violation of federal law by NYCHA and Freddie Mac.

Damages are sought for the named plaintiffs, injunctive relief is sought for the named plaintiffs and the class.

### Discussion

### I. *Class certification*

The Plaintiffs seek an order pursuant to Rule 23, Fed.R.Civ.P., certifying this action as a class action on their own behalf and under Rule 23, Fed.R.Civ.P. as representative of the class and sub-classes defined herein.

#### Class Warning and Notice

All persons residing on premises either owned, managed, or operated by any of the defendants or where they administer assistance payments under a federal housing program.

---

3. There are two claims for each cause of action. The first is brought on behalf of the Germans and the second on behalf of the Goffins. With the exception of the seventeenth and eighteenth causes of action, each cause of action is alleged against all of the defendants who are named in the complaint with regard to each of the named plaintiffs. The seventeenth and eighteenth causes of action allege violation of federal law. With respect to these two causes of action, the City of New York, with respect to 17, and NYCHA, with respect to 18, are the defendants against whom relief is sought. These defendants are sued on the federal claim in their capacity as public housing authorities.

*Sub–Class # 1: Medical Monitoring*

All persons age 8 years and under and all women of child-bearing age (12–50 years old) residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program.

*Sub–Class # 2: Abatement*

All persons age 8 years and under and all women of child-bearing age (12–50 years old) residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program, and where there is lead-based paint in or on the dwelling or common area.

## A. Applying Rule 23

Rule 23(c)(1), Fed.R.Civ.P., provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained."

■ In applying this Rule, courts have held that class action determinations are to be based solely on the allegations set forth in the complaint, which are accepted as true, *see Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978), and not on an inquiry into the merits of the plaintiff's claims, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 94 (S.D.N.Y.1981). Thus, the only question to be determined is whether the requirements of Rule 23 have been satisfied, and in making this determination, any references to the plaintiffs' factual allegations set forth below are not to be construed as findings of fact regarding the issues raised by those allegations.

■ Furthermore, the Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation, *see Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298, 301 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), and has explicit-ly noted its preference for class certification in suits involving public housing because of the fluid composition of the public housing population. *See Comer v. Cisneros,* 37 F.3d 775, 797 (2d Cir.1994).

However, despite the liberal interpretation that this Court must give to Rule 23, it may certify this as a class action only after undertaking "rigorous analysis" to assure that the requirements of the Rule are satisfied. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

Before addressing the specific requirements of Rule 23, the Court must address the standing and mootness issues raised by defendants.

## B. Standing

■ It is well-established that "the burden is on the party claiming jurisdiction to demonstrate that the court has jurisdiction over the subject matter." *International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 675 F.Supp. 146, 151 & n. 5 (S.D.N.Y.1987), *aff'd,* 875 F.2d 388 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). *See also McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Kheel v. Port of New York Authority,* 457 F.2d 46, 49 (2d Cir.), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972). Standing is an essential element of subject matter jurisdiction, and the question presented is whether this action should be dismissed against any of these defendants for lack of subject matter jurisdiction because plaintiffs do not have standing to bring it.

■ The fundamental principles governing whether a plaintiff has standing to maintain an action in federal court are straightforward and familiar. A plaintiff must "allege[ ] such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial power on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (internal quotation omitted). "At the core of the standing doctrine is the requirement that a plaintiff 'allege personal injury fairly trace-

able to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *County of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). The alleged injury cannot be "abstract" in character, *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); it must be "distinct and palpable," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (internal quotation omitted). The Supreme Court has explained that the requirements for standing arise out of a "single basic idea—the idea of separation of powers," *Allen*, 468 U.S. at 752, 104 S.Ct. at 3325, because they demarcate fundamental limits on the role of the federal courts in our tripartite system of government.[4]

The Second Circuit has prescribed the following test to determine whether plaintiffs have the requisite standing, noting that, while it is "[d]eceptively simple to state, standing entails a complex three-pronged inquiry":

> First, plaintiffs must show that they have suffered an injury in fact that is both concrete in nature and particularized to them. Second, the injury must be fairly traceable to defendants' conduct. Third, the injury must be redressable by removal of defendants' conduct. The second and third prongs—traceability and redressability—often dovetail; essentially, both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act. To establish standing, a plaintiff must plead all three elements.

*In re United States Catholic Conference*, 885 F.2d 1020, 1023–24 (2d Cir.1989).

■ As this Court has noted before, a plaintiff may not use the procedural device of a class action to bootstrap himself into standing he lacks under the express terms of the substantive law. *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74 (S.D.N.Y. 1986). It must be noted that the question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23. While standing to sue is an essential prerequisite to maintaining an action, whether in one's own right or as a representative of a class, these issues are not convertible. Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. *Vulcan Society of Westchester County v. Fire Dep't of City of White Plains*, 82 F.R.D. 379, 398 (S.D.N.Y.1979).

■ There is no issue of standing with regard to the proposed class representatives and defendants NYCHA, Freddie Mac, the 1710 defendants, PSC, or the City in its capacity as a PHA. Each of the plaintiffs resides now or at the time that the action was filed in a dwelling unit owned or operated by these defendants. *See Etuk v. Slattery*, 936 F.2d 1433, 1440–41 (2d Cir.1991). In the case of NYCHA, the Goffin home receives federal funds that are managed locally by NYCHA, as the local housing authority under Section 8. This was true at the time the action was filed and as far as the Court is aware is true at this time.

The complaint alleges the other necessary elements of standing. Namely that: 1) the plaintiffs have suffered an injury (elevated blood lead levels or exposure in their apartments to unacceptably high lead levels); 2) the defendants have failed to abate the lead as required by local and federal law, thus exposing the plaintiffs to the lead; and 3) that the injunctive relief sought, including notice, abatement of the lead and monitoring

---

4. In addition to these constitutional requirement, the Supreme Court has also recognized that the standing doctrine embraces certain prudential limitations on the exercise of federal jurisdiction, including "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. The Supreme Court has summarized this aspect of the standing inquiry as "[e]ssentially, ... whether the constitutional or statutory provisions on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (footnote omitted). In short, a federal court "is not the proper forum to press general complaints about the way in which government goes about its business." *Allen*, 468 U.S. at 760, 104 S.Ct. at 3329 (citation and internal quotation omitted).

until such time as the abatement was complete, would address the harm, the exposure to the lead based paint.

■ According to the defendants, there are so many sources of lead that it should not be assumed that lead in the apartments is the source of the alleged injury. However, the law requires abatement of unacceptable levels of paint in the home, not just abatement when blood levels in children rise above a statutorily defined threshold. In addition, "the ingestion of household dust containing lead from deteriorating or abraded lead-based paint is the most common cause of lead poisoning in children." 42 U.S.C. § 4851; *See* Rosen Aff. ¶ 24 (citing Agency for Toxic Substances and Disease Registry (ATSRD)) of the Public Health Service's report: *The Nature and Extent of Lead Poisoning in Children in the United States: A Report to Congress* (1988) (the "ATSRD Report"). The causal connection alleged between the presence of lead in the homes and injury or threat of injury to the plaintiffs is sufficient to establish standing.

■ There are, however, issues regarding standing to pursue the injunctive relief sought with regard to the City, as an owner of a building, CAISI and Tebec. The City was a past owner of the Montgomery Avenue property at the time the action was filed by the German plaintiffs, but has not owned the building since May 8, 1992, fourteen months before the initial complaint was filed in this action. As a representative of the class, the Germans are seeking only injunctive relief against the defendant City. They have no standing to do this. The standing with respect to the damages claims is not contested by the City and relates to the individual relief sought by the Germans under the state law claims. Plaintiffs have alleged that the City is also liable to the class in its capacity as a PHA that provided funds to the unit through the CDBG program. The City does not deny that it is currently acting in such a capacity. There is standing for the class to sue the City as a PHA.

CAISI and Tebec are in a similar position. Neither of them was involved with the Montgomery Avenue property at the time the initial complaint was filed. For the same reasons, there is no standing to pursue the claims for injunctive relief against them.

**C.** *Claims for Injunctive Relief are Not Moot with Respect to the 1710 Defendants, PSC, NYCHA, the City as a PHA or Freddie Mac*

■ Defendants Freddie Mac and the City have also argued that the class claims for injunctive relief against them are moot as to these named plaintiffs. The standing doctrine evaluates a litigant's personal stake at the onset of a case, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569–70 n. 4, 112 S.Ct. 2130, 2141 n. 4, 119 L.Ed.2d 351 (1992); *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir.1993), "the mootness doctrine ensures that the litigant's interest in the outcome continues throughout the life of the lawsuit." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir.1993) (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396–97, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980); *Etuk v. Slattery*, 936 F.2d 1433, 1441 (2d Cir.1991)).

■ Once the conduct of which a class representative complains is no longer directed at that person, the person's personal claim for injunctive relief from that conduct is moot. *See Clarkson v. Coughlin*, 783 F.Supp. 789, 795 (S.D.N.Y.1992). For example, in *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985) (per curiam), the Second Circuit held that the plaintiff's claim for injunctive relief from solitary confinement was moot because the period of confinement had lapsed. The plaintiff could still pursue his claim for lost good time credits, however. Likewise, in *Beyah v. Coughlin*, 789 F.2d 986, 988–89 (2d Cir.1986), the Court of Appeals held that the plaintiff's complaint directed at allegedly unconstitutional practices at a particular institution was moot to the extent it sought declaratory and injunctive relief once the plaintiff was transferred to a different institution. *See also Lucas v. Hodges*, 730 F.2d 1493, 1497 & n. 10 (D.C.Cir.), *vacated as moot*, 738 F.2d 1392 (D.C.Cir.1984). To the extent that the Goffins seek such equitable relief individually against the Freddie Mac defendants, their claims are moot.

This does not mean, however, that this portion of the action should be dismissed. Under the more "flexible" approach applied to class claims, the complaint itself is not rendered moot merely because the named plaintiff's claim is moot. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 50–52, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991); *United States Parole Commission v. Geraghty,* 445 U.S. 388, 400, 100 S.Ct. 1202, 1210–11, 63 L.Ed.2d 479 (1980); *Etuk v. Slattery,* 936 F.2d 1433, 1441 (2d Cir.1991); *Washington v. Wyman,* 54 F.R.D. 266, 270–71 (S.D.N.Y.1971). From the time a class action is filed until the time a final determination pursuant to Rule 23 is made, the action is treated as if the class existed for purposes of mootness. *See McLaughlin,* 500 U.S. at 50–52, 111 S.Ct. at 1667; *Geraghty,* 445 U.S. at 404, 100 S.Ct. at 1212–13. This provides unnamed members of the plaintiff class an opportunity to intervene in the action and to pursue their claims. Here, intervention was sought and obtained by the Goffins, indicating the strong likelihood that some other named plaintiff exists who will be able to represent the putative class adequately. *See also Jane B. v. New York City Department of Social Services,* 117 F.R.D. 64, 66–69 (S.D.N.Y.1987).

The Court of Appeals has recently discussed, in great detail, the principles that underlie mootness doctrine with respect to the claims of the public housing population in *Comer v. Cisneros,* 37 F.3d 775, 797–99:

> In general, "a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969) (internal quotation marks omitted)).

> The mootness doctrine is riddled with exceptions, however. Among the exceptions pertinent to this case [is] ... the "capable of repetition" doctrine, *Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532 (1975) (Iowa state court dismissed wife's petition for divorce because she failed to meet state's one-year residen-

cy requirement; not moot when wife met residency requirement because the problem to potential divorcees posed by the residency requirement was "capable of repetition, yet evading review"); *Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998 n. 2, 31 L.Ed.2d 274 (1972) (challenge against Tennessee law barring persons from registering to vote unless, at the time of the next election, they resided in the State for at least one year and in a particular county for at least three months; not moot when litigant became eligible to vote); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712–13, 35 L.Ed.2d 147 (1973) (pregnant woman challenged anti-abortion statute; not moot when pregnancy terminated); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see also *DeFunis v. Odegaard,* 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (per curiam) (holding that equal protection claim in pre-Bakke affirmative action suit was mooted by plaintiff's being registered in his final quarter of law school).

The Court of Appeals has noted that the application of these various mootness doctrines depends in part on whether the court is presented with a class action because, in general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot. *Board of School Commissioners of Indianapolis v. Jacobs,* 420 U.S. 128, 129–30, 95 S.Ct. 848, 849–50, 43 L.Ed.2d 74 (1975) (per curiam). In contrast, class certification will preserve an otherwise moot claim. *McLaughlin,* 500 U.S. at 51–52, 111 S.Ct. at 1667–68. "In class actions ... courts have come to recognize that an individual plaintiff may continue to represent the interests of others even after any prospect of individual recovery has vanished." 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.9 (1984 & Supp.1994); see also *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54.

Under the appropriate circumstances, class certification may relate back to the filing of the complaint. *Comer,* 37 F.3d at 800 (citing *McLaughlin,* 500 U.S. at 52,

111 S.Ct. at 1667; *Sosna,* 419 U.S. at 402, n. 11, 95 S.Ct. at 559, n. 11). One such circumstance is where the claims are " 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.' " *McLaughlin,* 500 U.S. at 52, 111 S.Ct. at 1667 (quoting *Geraghty,* 445 U.S. at 399, 100 S.Ct. at 1210); *Gerstein,* 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11 (class action challenging state practice of holding for trial without probable cause hearing; named class representatives convicted prior to Supreme Court review; not moot because the nature of pretrial detention is such that "it was most unlikely" that the courts would determine the constitutional challenge prior to conviction or release; furthermore, the case was capable of repetition); *Comer,* 37 F.3d at 800. In such cases, the courts permit the class certification to relate back to the filing of the complaint and hold that the plaintiffs have properly preserved the merits of the case for judicial resolution. *Swisher v. Brady,* 438 U.S. 204, 213 n. 11, 98 S.Ct. 2699, 2705 n. 11, 57 L.Ed.2d 705 (1978); *Sosna,* 419 U.S. at 402 n. 11, 95 S.Ct. at 559 n. 11.

In *Comer,* even though a class had not yet been certified, the Court of Appeals held that when the claims of the named plaintiffs became moot prior to class certification, "we need not decide whether the potential mootness of the claims of the named plaintiffs moots the entire case because, as we stated above, this is certainly the type of harm that is 'capable of repetition, yet evading review.' " *citing Sosna,* 419 U.S. at 399–400, 95 S.Ct. at 557–58. *Comer,* 37 F.3d at 800. In *Comer* minority residents brought a class action on behalf of city public housing project residents and applicants for federal housing assistance alleging violations of the Fair Housing Act. In determining that the claims related back to the date of the original filing, the Court of Appeals stated in the circumstances of that case, "in particular, the transitory nature of the public housing market...." the case would relate back to the original filing.

■ In this case, the Goffins' original complaint was filed on August 22, 1994. The complaint asked for class certification and for class action equitable relief. At the time that the complaint was filed the claims against Freddie Mac were not moot. The Court finds that the same issues of a transitory population exist in these circumstances. In addition, we have seen in the short life of this case how frequently ownership of buildings turns over. Applying the "capable of evading review" exception to this case, and following the direction established in *Comer,* the class certification relates back to the original filing and Freddie Mac is an appropriate defendant for the plaintiff class that the Goffins seek to represent.

Thus after reviewing the parties for standing and mootness, the defendants remaining in the motion for certification of the class include 1710, PSC and NYC as a PHA under the claims brought by the German plaintiffs and Freddie Mac as the owner and NYCHA as the PHA under the claims brought by the Goffin plaintiffs.

### D. *The Requirements of Rule 23(a)*

Rule 23(a) provides that:

[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If these criteria are not met, an action may not be maintained as a class action. F.R.C.P. Rule 23(b). Each of these criteria is considered in turn below. In addition, since there are several defendants which have non-overlapping relationships with the proposed plaintiff class, the requirements of 23(a) will be assessed, where necessary, with respect to each defendant—as defining a potential sub-class—separately. *See* Fed. R.Civ.P. 23(c)(4)(B).

#### 1. *Numerosity and Impracticability*

■ As a preliminary matter defendants claim that there is no logical connection between the defendants in this suit except that

they each at one time or another owned the buildings in which the named plaintiffs live or lived and that class treatment is thus inappropriate. While it is true that the named plaintiffs do not each have standing to sue each of the defendants, that does not end the discussion. This court has already determined that joinder of these parties was proper. *See German v. FHLMC,* 1994 WL 319154 at *3 (S.D.N.Y.1994). It has also determined that there is standing to sue a number of the defendants. Because each defendant in the class action portion of this suit is a separate legal entity, individually responsible for notification and abatement of lead in its dwellings, there must be a subclass for each defendant owner that remains. *See* Fed.R.Civ.P. 23(c)(4)(B); *Vulcan Soc. of Westchester Cty. v. Fire Dept. of City of White Plains,* 82 F.R.D. 379, 399 (S.D.N.Y. 1979). The question of numerosity will be determined for each defendant separately. *See* Fed.R.Civ.P. 23(c)(4)(B).

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder. *Northwestern National Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. 507, 511 (S.D.N.Y. 1984); *Goldstein v. North Jersey Trust Company,* 39 F.R.D. 363, 367 (S.D.N.Y.1966). Precise quantification of the class members is not necessary because the court may make "common sense assumptions" to support a finding of numerosity. *In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130, 137 (D.N.J. 1984), *rev'd on other grounds,* 843 F.2d 1537 (3d Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988).

■ Plaintiffs' proposed class is so numerous that joinder of all members is impracticable. Occupied residential units acquired by Freddie Mac, between 1990 and August 1994, number 747 units nationwide, with 187 of them in New York City. This number does not include any units acquired before 1990 which may increase the size of the potential class. Many of these units may well house members of this class.

It is alleged that the City owns and administers funds under CDBG, as well as other federal programs to over 30,000 units. While there are no specific estimates of the number of units managed by NYCHA, plaintiffs place the number of individuals living in NYCHA associated housing in the thousands. NYCHA does not refute this.

■ The 1710 defendants own at least the 49 units in the Montgomery property. There is no information on the record regarding the number of potential class members in these units. The Court agrees with the 1710 defendants that the number is identifiable and that joinder of plaintiffs located at one address should be possible. The Court therefore denies a motion for class certification as it relates to the 1710 defendants.

In so far as there has been no individual estimate of the number of units managed by PSC, class certification is denied for lack of numerosity against this defendant as it was against the defendant owner of the building.

In the case of the remaining class defendants, joinder of the hundreds or thousands of individuals who fit within the specified classes here, where "the actual number of individuals cannot be ascertained with certainty," is surely impracticable. *See Stenson v. Blum,* 476 F.Supp. 1331, 1335 (S.D.N.Y. 1979). *See also McCoy v. Ithaca Hous. Authority,* 559 F.Supp. 1351, 1355 (N.D.N.Y. 1983).

■ Plaintiffs need not establish the precise number of class members in order to meet the numerosity requirement. *Ellender v. Schweiker,* 550 F.Supp. 1348, 1359 (S.D.N.Y.1982), *app. dism'd,* 781 F.2d 314 (2d Cir.1986), *cert. denied,* 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986). It is permissible for the plaintiffs to rely on reasonable inferences drawn from the available facts. *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 252 (S.D.N.Y. 1989).

Here, as in *McNeill,* more precise information as to the numbers of persons affected is within defendants' control. Nevertheless, "there is something within the record from which it can be inferred that a class does exist," and "a rough estimate could be made."

*See Clarkson v. Coughlin,* 783 F.Supp. 789, 798 (S.D.N.Y.1992). Even where the estimated class membership is only in the "hundreds," and "the exact number of class members could not be determined because the pertinent information was within the defendants' control," class certification is proper. *Id.* (citing *Folsom v. Blum,* 87 F.R.D. 443, 445 (S.D.N.Y.1980)). *See also Lewis v. Gross,* 663 F.Supp. 1164, 1169 (E.D.N.Y. 1986) (estimated 2,000 members); *Ventura v. New York City Health & Hospitals Corp.,* 125 F.R.D. 595, 599 (S.D.N.Y.1989) (estimated class of at least 100 members). In fact, the courts in this circuit have routinely held that classes smaller than the class proposed here are sufficiently numerous for class certification. *See, e.g., Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972) (certifying class which may be limited to 70 investors); *McNeill,* 719 F.Supp. at 252 (1,059 Section 8 tenants whose subsidies were suspended or terminated); *Fidelis Corp. v. Litton Industries, Inc.,* 293 F.Supp. 164, 170 (S.D.N.Y. 1968) (certifying class of 35–70 individuals). In sum:

> there is no magic minimum number that breathes life into a class, *see Bruce v. Christian,* 113 F.R.D. 554, 556 (S.D.N.Y. 1986), and lack of knowledge of the exact number of persons affected is not a bar to certification where the defendants alone have access to such data, *see McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 252 (S.D.N.Y.1989); *Folsom v. Blum,* 87 F.R.D. 443, 445 (S.D.N.Y. 1980)....

*Clarkson v. Coughlin,* 783 F.Supp. at 798.

The number of plaintiffs living in units owned by Freddie Mac or receiving funds through the City or NYCHA in their capacity as PHA's certainly meet the requirement of 23(a)(1).

### 2. *Commonality and Predominance*

■ Rule 23(a)(2) and (3) require that, for an action to be properly maintained as a class action, there must be questions of law or fact common to the class which predominate over questions peculiar to individual members of the class. When such common questions do predominate, differences among the questions raised by individual members will not defeat commonality. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 37 (S.D.N.Y.1977); *appeal dismissed,* 574 F.2d 656 (2d Cir.1978).

"It is not necessary that each and every issue be raised by each and every member of the class or class representatives and a grouping of similar claims has generally been allowed." *Vulcan Soc'y v. Fire Dep't,* 82 F.R.D. 379, 401 (S.D.N.Y.1979). In fact, a single common question has been sufficient to satisfy the commonality requirement. *See Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y.1992); *McCoy v. Ithaca Housing Authority,* 559 F.Supp. 1351, 1355 (N.D.N.Y.1983).

■ Plaintiffs assert that the following questions of law or fact are common to all plaintiffs in the proposed class:

a) whether lead paint in residential dwellings creates a hazard to residents, particularly children and women of childbearing age;

b) whether defendants are aware of their obligations not to expose tenants to lead poisoning hazards in buildings that they own, manage or operate or where they administer federal funds;

c) whether defendants properly inspected these properties;

d) whether defendants properly maintained these properties full of lead hazards;

e) whether defendants warned plaintiffs on the lead hazards in these buildings;

f) whether children should be medically monitored to protect against lead poisoning and its effects;

g) whether defendants should be required to create a fund to pay for ongoing medical surveillance and monitoring to pay for ongoing medical surveillance and monitoring of children defendants have wrongfully exposed to lead poisoning;

h) whether defendants should be required to notify, warn, and provide monitoring for lead hazards that they know or should know exist on the properties that they own, manage, or operate or where they administer federal funds;

i) whether defendants should be required to abate lead hazards that they know or should know exist on these properties;

j) whether defendants' actions constitute negligence *per se;*

k) whether defendants are strictly liable for the injuries to plaintiffs;

l) whether defendants are liable for punitive damages

m) whether defendants should be prohibited from evicting any tenants without demonstrating that the premises are free of lead hazards;

n) whether defendants should be prohibited from withholding security deposits from tenants in apartments with lead hazards; and

o) whether defendants should be required to notify tenants of their right to withhold rent because of lead hazards.

Complaint, ¶ 50.

The plaintiffs describe several sets of scenarios which define the sub-classes that they request including plaintiffs. The specific facts of the circumstances might arise in a case where damages were sought for every class member, but in this action for injunctive relief, the specific types of situations can be resolved by the designation of sub-classes.[5] Fed.R.Civ.Proc. 23(c)(4).

Further proceedings may reveal that some of the questions raised by the plaintiffs require individual inquiries, inappropriate for a class action, which can be resolved either by further defining the scope of the class action, by designating further sub-classes or by de-certifying the class if that were to become necessary.

Even if "each member of the class presents a slightly different factual situation, each presents a common legal question." *Stenson v. Blum,* 476 F.Supp. at 1335 (citing *Lyons v. Weinberger,* 376 F.Supp. 248, 263 (S.D.N.Y.1974); 3B *Moore's Federal Practice* ¶ 23.06–1 at 23–176, 23–180 (3d ed. 1978)). Here, all plaintiffs have a number of legal claims against defendants.

The common questions of law generally pertain to whether defendants have failed to abide by the laws' requirements that housing owners and administrators of federal housing program funds provide and assure provision of decent, safe, and sanitary housing to the residents, in compliance with federal, state, and local housing standards, including, *e.g.,* requirements of LPPPA, 42 U.S.C. § 4822 *et seq.,* and federal regulations thereunder, 24 C.F.R. pt. 35; 42 U.S.C. § 1437f and federal regulations thereunder, 24 C.F.R. §§ 882.109(i), 882.116, 882.404(c); New York City Administrative Code §§ 27–2013(h) and 27–2126(b); and 24 R.C.N.Y. §§ 173.13(d) and 173.14.

In terms of the common law claims, there is a question as to what level of lead constitutes a danger. While certain levels have been recited in local and federal laws, the plaintiffs argue lower levels constitute harm.

There are sufficient common questions of fact and law to satisfy this requirement.

### 3. *Typicality*

Rule 23(a)(3) requires that the claims asserted by plaintiffs on behalf of a proposed class be typical of the claims of the other members of the class.

Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981); *see Gary Plastic Packaging Corp. v. Merrill Lynch,* 903 F.2d 176, 179 (2d Cir.1990).

The plaintiffs in this action, like every other member of the proposed Class, are tenants in multiple dwellings in New York City that receive federal funding whose health is the concern of local, state and feder-

---

**5.** As discussed later in this opinion there will need to be sub-classes that represent tenants in multiple dwellings owned by or receiving appro-

priate federal funding through each of the class action defendants.

al regulations. The fact that the named plaintiffs are seeking damages on their own behalf does not make them inappropriate as class representatives. *See Green v. Wolf Corp.,* 406 F.2d 291, 300 (2d Cir.1968) (holding that differing levels of damages does not dictate against use of class action); *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986) (holding that plaintiffs' individual request for damages does not prevent class certification under 23(b)(2)); *Gelb v. A.T. & T. Co.,* 150 F.R.D. 76 (S.D.N.Y.1983) (same). Nor does the Court believe that the putative class representatives are subject to such individualized defenses which threaten to become the focus of litigation. *See Gary Plastic Packaging,* 903 F.2d at 179. If this were to become the case, certainly other class representatives could be appointed to represent the class on the common issues relating to the injunctive relief sought.

In its motion to dismiss, NYCHA has raised its objection to plaintiffs holding NYCHA liable as an owner of buildings. While it is undisputed that NYCHA owns many dwelling units in the City, none of the named plaintiffs live in such units. As such, NYCHA can be a defendant only in its capacity as a public housing authority. For the reasons discussed above in the standing section, the City will also be a defendant in the class action as a public housing authority.

This requirement has been met, however, as to the other remaining defendants liable to the proposed class.

### 4. *Representation*

■ Rule 23(a)(4) requires that the plaintiffs be adequately representative of the class. The Court of Appeals has held plaintiffs must satisfy both prongs of a two-pronged test to qualify as adequate representatives: (1) the named plaintiffs' interests must not conflict with the class members' interests, and (2) the named plaintiffs and their attorney must be able to prosecute the action vigorously. *General Tel. Co. v. Falcon,* 457 U.S. 147, 157 & n. 13, 102 S.Ct. 2364, 2370–71 & n. 13, 72 L.Ed.2d 740 (1982); *Dean v. Coughlin,* 107 F.R.D. 331, 334 (S.D.N.Y.1985). The commonality and typicality requirements blend together in determining whether the representative plaintiffs' claims are typical enough of the classwide claims that the representatives will adequately represent the class. *General Tel. Co. v. Falcon,* 457 U.S. at 157 & n. 13, 102 S.Ct. at 2370–71 & n. 13.

■ The plaintiffs must show, first, that there is an absence of conflict and antagonistic interests between them and the class members, and second, that the plaintiffs' counsel is "qualified, experienced and capable." *Ross v. A.H. Robins Co.,* 100 F.R.D. 5, 7 (S.D.N.Y.1982); *accord In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992).

### (a) *Absence of Conflict*

■ The named plaintiffs' representatives have stated a substantial stake in the controversy and are able to protect the interests of the class. *See McNeill v. New York City Housing Authority,* 719 F.Supp. at 253. While defendants have raised issues with regard to the depth of understanding that the named plaintiffs have about the class action component of this suit, the Court is satisfied that they understand it sufficiently well to act as class representatives.

The Court finds no fundamental conflict or inconsistency between the claims of the proposed class members. *See Caleb v. DuPont De Nemours,* 110 F.R.D. 316, 319 (S.D.N.Y. 1986). Each of the class members has an interest in seeing that any dangerous lead-paint conditions are fixed in their homes. The class representatives do not appear to be motivated by anything other than the causes of action.

[T]here is little "likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to the remainder of the class," ... and the interest of [the] representative party, is "co-extensive with the interest of the entire class," ... because all seek to enjoin defendants' action. *See Bacon v. Toia,* 437 F.Supp. 1371, 1381 (S.D.N.Y.1977), *aff'd,* 580 F.2d 1044 (2d Cir.1978).

*Stenson v. Blum,* 476 F.Supp. at 1335 (quoting *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968)).

This prong is satisfied.

### (b) *Qualification of Counsel*

■ The second prong is that "the party's attorney be qualified, experienced, and generally able to conduct the proposed litigation." *Id.* at 563. *See also Nilsson v. Coughlin,* 670 F.Supp. 1186, 1191 (S.D.N.Y. 1987). Plaintiffs are represented by two law firms in the New York City area who have handled large numbers of lead paint cases. *See, e.g., N.Y.C. Coalition to End Lead Poisoning v. Koch,* 138 Misc.2d 188, 524 N.Y.S.2d 314 (Sup.Ct.N.Y.Co.1987), *aff'd,* 139 A.D.2d 404, 526 N.Y.S.2d 918 (1st Dep't 1988), *on remand,* N.Y.L.J., July 21, 1989, at 18 (Sup.Ct.N.Y.Co.), *aff'd,* 170 A.D.2d 419 (1st Dep't 1991), *on remand,* N.Y.L.J., May 13, 1993, at 29 (Sup.Ct.N.Y.Co.); Fitzgerald Decl. (Sept. 26, 1994); L. Billings, *Developing Regulations for the Safe Abatement of Lead Paint,"* 1 N.Y.U.Envtl.L.J. 7 (1992); L. Billings, *Development of Safety Procedures for Abatement of Lead–Based Paint,* 25 Clearinghouse Rev. 1540 (Apr.1992).

In addition, Bronx Legal Services and its Director of Special Litigation Lucy Billings have handled many class actions, class actions related to lead paint exposure, as well as other class actions seeking injunctive relief seeking compliance with federal, state, and local statutory, regulatory, and common law duties and that plaintiffs' rights under those laws are protected.

Legal Services, like counsel for plaintiffs and the proposed plaintiff class here, are generally experienced in class action litigation in federal and state courts and therefore " 'qualified, experienced and generally able to conduct the proposed litigation.' " *See Stenson v. Blum,* 476 F.Supp. at 1335 (quoting *Eisen v. Carlisle,* 391 F.2d at 562). *See also McNeill v. New York City Housing Authority,* 719 F.Supp. at 253. Here, counsel are particularly experienced and qualified in matters relating to lead paint exposure. *See New York City Coalition to End Lead Poisoning,* 138 Misc.2d 188, 524 N.Y.S.2d 314 (Sup.Ct., N.Y.County 1987); *Caleb v. DuPont De Nemours,* 110 F.R.D. at 319. Counsel

have already demonstrated to date that they will prosecute this action vigorously and competently, and it is expected that they will continue to do so.

■ The City and Freddie Mac raise issues regarding the character of the lawyers from Fitzgerald & Fitzgerald, one of the two proposed joint plaintiffs counsel for this litigation. They allege that the firm, through its employee, Dr. Perez, engaged in improper solicitation by offering occupants of the St. Nicholas building free lead testing and by failing to identify himself as an agent of Fitzgerald & Fitzgerald.

While some courts have held that the ethical conduct of counsel is relevant to the issue of adequacy of counsel, there is no unquestionable proof on this record that such improper solicitation has occurred. *See Brame v. Ray Bills Finance Corp.,* 85 F.R.D. 568 (N.D.N.Y.1979) (holding that the seriousness of the breach and the possibility of prejudice to the class will have to be evaluated).

While improper solicitation is a serious allegation, the parameters for defining improper solicitation in the context of class action litigation is not straightforward. The New York Bar Association in its opinions # 124 and # 499, discussing solicitation in a class action context, state that one exception to the prohibition to the general rule of no solicitation is when "the needs of [an attorneys client] will be promoted by enlisting the cooperation of others who are actually interested in the outcome of the litigation...." New York State Bar Association, Opinion # 499 (quoting N.Y.City 717). The opinions also point out that it is important that the lawyer not gain additional clients for additional fees from the activity.

It has not been established that Fitzgerald & Fitzgerald stood to gain financially from the actions taken by Perez. It is, in fact, particularly unlikely given that in the class action itself, the relief sought is injunctive. *See Harris v. General Development Corp.,* 127 F.R.D. 655, 662 (N.D.Ill.1989) (noting that the number of named plaintiffs does not ordinarily affect the size of the fee award and holding that advancing costs to class members is not indicative of compromised repre-

sentation). This does not raise the same issues as a class action for damages might when a lawyer working on a contingency fee might have a lot to gain from an ever larger class.

In his affidavit John E. Fitzgerald admits that Perez agreed to convey the tenants' requests for lead testing to the law firm and that he spoke to people that he was not authorized to speak to, but these conversations do not constitute ethical breaches that should disqualify counsel. The affidavits and declarations of most tenants in the building negate the claims by defendants regarding solicitations. The allegations of improper solicitation have not been established by the defendants in this case.

In its defense, Fitzgerald and Fitzgerald, in addition to arguing that they have done nothing wrong, allege improprieties on behalf of Siff Rosen, PC attorneys and their agents. Particularly, Fitzgerald alleges that documents were falsified and false statements were solicited from defendants' agent to make it appear that an unlawful solicitation of a tenant in the building, Ms. Cepeda, had occurred. Affidavits from the tenant and from one of the defendants' agents, supplied by plaintiffs make it appear that the alleged solicitation never took place.

Plaintiffs have asked for fines and Rule 11 sanctions for the actions of defendants in this case both for the above described incident and for allegations of misstated statutes and cases. While the allegations are troubling, the Court cannot resolve the issues without further hearings with regard to the alleged fabrications. While license has been taken by both sides with regard to the holdings of cases or citation of statutes, the Court is not convinced that it rises to the level of sanctionable activity.

The available record fails to establish that serious wrongdoings occurred on either side of this very contentious litigation and does not permit a finding of unfit counsel on one hand or to impose sanctions on the other.

Plaintiffs, therefore, meet the requirement under Rule 23(a)(4) that the representatives will fairly and adequately protect the classwide interests in this action. The criterion of adequate representation has been satisfied by the plaintiffs.

### E. The Requirements of Rule 23(b)

In order to maintain a class action, plaintiffs must satisfy the requirements of Rule 23(b) in addition to satisfying the prerequisites of Rule 23(a). Pursuant to Rule 23(b)(2), a class action may be maintained where:

> The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

The plaintiffs have alleged that the defendants have acted in ways generally applicable to the class in failing to comply with their statutory and regulatory duties and to fail to act in such a way that all class members are unnecessarily at risk for exposure to dangerous levels of lead paint in their homes. Plaintiffs claim that through discovery they will demonstrate a common course of conduct of defendants toward tenants in the plaintiff class. While it may be difficult to prove the common policies or practices required to obtain the sought relief, this level of proof is not necessary on a motion for class certification.

The plaintiffs seek several forms of injunctive relief, including written warnings to plaintiffs who are defendants' tenants about the hazards of lead paint in their housing, medical monitoring of any injuries to plaintiffs, a plan for inspection and safe abatement of lead on all painted surfaces in the housing defendants were or continue to be responsible for, notice to plaintiff tenants of their right to withhold rent because of lead paint in their housing; and information that will permit efficient provision of this relief. Plaintiffs are not asking for damages for the class members, with the exception of the named plaintiffs; the relief they are requesting is arguably all injunctive.

Defendants have two primary objections to the certification of the class as it pertains to the requirements of 23(b)(2). The first is

that the plaintiffs have not shown injury[6] and the second is that this action is, in fact, an action for damages trying to disguise as one for injunctive relief in order to attain class status.

### 1. *Actual or Threatened Injury is Alleged*

■ In order to establish a claim for equitable relief, the plaintiff must (1) allege that they are suffering " 'actual or threatened injury as a result of the putatively illegal conduct of [the] defendants.' " *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)); (2) the alleged injury is reasonably traceable to the challenged action *Id.; Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); and (3) The alleged injury is "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

Courts have found that exposure to lead paint can constitute injury. *See Hurt v. Philadelphia Housing Authority,* 806 F.Supp. 515 (E.D.Pa.1992); *N.Y.C. Coalition to End Lead Poisoning (NYCCELP) v. Koch,* N.Y.L.J., May 12, 1993, at 29 (Sup.Ct. N.Y.Co.). And the comprehensive statutory schemes developed by the federal, state and local governments are further indication that the threat of harm from lead-based paint are significant.

Federal recognition of the problem was codified as recently as 1992 (and reaffirmed on December 8, 1994) in the "Findings" section of 42 U.S.C. § 4851:

The Congress finds that—

(1) low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children under age 6, with minority and low-income communities disproportionately affected;

(2) at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems;

(3) pre–1980 American housing stock contains more than 3,000,000 tons of lead in the form of lead-based paint, with the vast majority of homes built before 1950 containing substantial amounts of lead-based paint;

(4) the ingestion of household dust containing lead from deteriorating or abraded lead-based paint is the most common cause of lead poisoning in children;

(5) the health and development of children living in as many as 3,800,000 American homes is endangered by chipping or peeling lead paint, or excessive amounts of lead-contaminated dust in their homes;

(6) the danger posed by lead-based paint hazards can be reduced by abating lead-based paint or by taking interim measures to prevent paint deterioration and limit children's exposure to lead dust and chips;

(7) despite the enactment of laws in the early 1970's requiring the Federal Government to eliminate as far as practicable lead-based paint hazards in federally owned, assisted, and insured housing, the Federal response to this national crisis remains severely limited; and

(8) the Federal Government must take a leadership role in building the infrastructure—including an informed public, state and local delivery systems, certified inspectors, contractors, and laboratories, trained workers, and available financing and insurance—necessary to ensure that the national goal of eliminating lead-based paint hazards in housing can be achieved as expeditiously as possible.

■ Plaintiffs will certainly be required at trial to proffer evidence to prove their claims. Their claims of lead poisoning or exposure to lead poisoning, being placed in a position where they are likely to be lead poisoned, because of defendants' conduct, are sufficiently alleged to provide the basis for seeking injunctive relief.

---

**6.** The lack of injury or irreparable harm are also raised in defendants' motions to dismiss and for summary judgment. The arguments there will be addressed here.

Plaintiffs also allege that significant harm results from lead level "well below the 10 ug/dL," the Centers for Disease Control ("CDC") defined danger level. (CDC 1991). Rosen states that "blood lead levels even well below 10 ug/dL ... are directly related to cognitive and neurobehavioral deficits.... These deficits in intellectual performance are considered irreversible." Rosen aff. ¶ 17.

In the case of the Goffin plaintiffs, questions of fact still remain unanswered regarding the level of lead in the apartment. While, in their motion to dismiss, the Freddie Mac defendants allege that the lead levels are below federal and local standards, plaintiffs' expert has found lead levels of dust wipe samples taken on a the exterior sill of a bedroom, at levels exceeding standards, and on interior levels that indicated the presence of lead. Plaintiffs assert that the levels detected present the threat of significant and irreversible harm to the children living in the home. Resolving all ambiguities and inferences to be drawn from the underlying facts in favor of the party opposing the motion and all doubts as to the existence of a genuine issue for trial against the moving party, *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988), summary judgment is not appropriate on the record presented.

Questions regarding the risk of harm faced by both the German and the Goffin plaintiffs cannot be decided on the motions for summary judgment before this court.

The alleged harm and the threat of harm based on exposure to lead-based paint is sufficient to entitle plaintiffs to assert their claims for relief in the class context[7].

7. The motions for summary judgment on the harm suffered by the children or the threat of irreparable harm are also denied at this time.

8. The Second Amended Complaint requests injunctive relief requiring the defendants to warn their tenants about the hazards of lead paint in their housing and to notify their tenants that they have the right to withhold rent because of lead paint in their dwelling; to create a fund to carry out medical monitoring of the plaintiffs; to submit a plan for the inspection and abatement of lead hazards; to submit a list of all properties owned or managed by the defendants that have been cited by any government agency for lead

## 2. *Medical Monitoring Conditionally Found to Constitute Equitable Relief*

The defendants argue that the request for medical monitoring is simply a legal damages request trying to disguise as injunctive relief. They further argue that because the medical monitoring fund is the bulk of the relief sought and because it is only a damages remedy, this class action which must primarily be for injunctive relief must fail.

■■■ The plaintiffs have asked for numerous injunctive forms of relief, the medical monitoring being only one piece. The request for the injunctive relief other than the medical monitoring are on their own sufficient to grant certification of this class under Rule 23(b)(2)[8].

Plaintiffs contend that the monitoring of children exposed to lead is a form of equitable relief. They propose that defendants pay money into a fund which will be used to detect the onset of new cases of elevated blood lead levels in the at risk plaintiff class.

While payment of money to plaintiffs has the sound of damages, there are circumstance in which courts have recognized medical monitoring programs as a form of injunctive relief. In those cases the purpose of the medical monitoring often included an information collection or disbursement function and often involved court run programs staffed by court appointed physicians. *See Barth v. Firestone Tire & Rubber Co.*, 661 F.Supp. 193, 203–4 (N.D.Cal.1987) (allowing as injunctive relief a medical monitoring fund that would gather and forward to treating physicians information relating to the diagnosis and treatment of diseases which may

paint hazards, all information identifying any of their tenants who have been lead poisoned, and all reports, studies or other information about lead hazards in any of the properties that they own or manage; and to submit all information and communications provided by the insurers of their properties regarding lead hazards. In addition, the Complaint seeks injunctive relief prohibiting the defendants from initiating eviction proceedings against any tenant or withholding any portion of any security deposit paid by any tenant without proof that the tenant's premises has no lead paint in violation of law.

result from the plaintiffs exposure to a toxin (whose effects were little known); *Day v. N.L.O.*, 144 F.R.D. 330, 335–36 (S.D.Ohio 1992) (medical monitoring program established by the court, managed by court-appointed and court-supervised trustees, pursuant to which a plaintiff would be monitored by particular physicians was held to be equitable relief in certification of a 23(b)(2) class); *Cook v. Rockwell International Corp.*, 778 F.Supp. 512, 515 (D.Colo.1991) (distinguishing between medical monitoring claims that did not constitute injunctive relief (a lump sum paid to plaintiffs) and one that did (a lump sum placed into a fund that is administered by the court.))[9] In other cases, courts have not permitted medical monitoring as a form of injunctive relief. *See Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (affirming lower courts denial of right to medical surveillance as award for future damages disallowed by Virginia and West Virginia law in the absence of the requisite physical injury).

Defendants rely on *Askey v. Occidental Chem.*, 102 A.D.2d 130, 477 N.Y.S.2d 242, 247 (4th Dep't 1984) for the proposition that in New York medical monitoring is only available as an element of consequential damages.[10] The sentence from which that proposition is drawn reads: "If a plaintiff seeks future medical expenses [including medical monitoring] as an element of consequential damage, he must establish with a degree of reasonable medical certainty through expert testimony that such expenses will be incurred." The court did not hold that medical monitoring could not be relief other than as a part of consequential damages.

The plaintiffs have described the need for monitoring as part of the relief required to ensure that class members are not harmed by exposure to lead-based paint. This relief complements the other forms of injunctive relief sought. As stated earlier in the June 27, 1994 Opinion, plaintiffs have presented a colorable claim for medical monitoring as injunctive relief.

The defendants also argue that funding is not necessary to pay for the monitoring since some or all of it will be paid for by Medicaid. Again, the details of the monitoring program will require further development. It may well be that the cost of much of the screening that plaintiffs claim is required will be paid for by Medicaid. It may well be that some of it will not be, either because some of the plaintiff class is not Medicaid eligible or because the monitoring required by this litigation requires things that are not covered under Medicaid's program. There is insufficient data on this record about the needs of the class or the services provided by Medicaid to evaluate this argument by defendants. Further testimony and discovery will be required to determine the final contours of this proposed remedy.

The plaintiffs have thus satisfied the requirements of Fed.R.Civ.P. 23(a) and 23(b)(2), and a class will be certified consistent with the discussion above and subject to the modifications below.

### F. *Class Definition*

Having found that a class action is proper, the next question is the definition of the class. *See Gill v. Monroe County Department of Social Services*, 79 F.R.D. 316, 330 (W.D.N.Y.1978).

■ The class as defined by the plaintiffs is somewhat broad. As written, the class could conceivably include plaintiffs across the country in various states, with landlords subject to various local and state laws regarding lead and conflict of law questions regarding the underlying substantive claims. In order to make the class manageable, the class will be limited to applicable children and women of child-bearing years residing in New York

---

**9.** While it is true that *Cook* did not decide whether the medical monitoring fund could be the sole basis for injunctive relief for the purposes of certifying a 23(b)(2) class, this is not the case here either.

**10.** Freddie Mac also cites *Acevedo v. Consolidated Edison Co.*, 189 A.D.2d 497, 596 N.Y.S.2d 68 (1st Dep't 1993) for this proposition. *Acevedo* is also not clear on this point. In deciding that claims for medical monitoring were barred by the exclusivity of Workers Compensation, the Court stated that medical monitoring was one at law. There was no rationale offered for this conclusion, nor was there a statement of its exclusivity as a non-injunctive remedy.

City in housing owned or operated by these defendants on receiving federal funds. To do otherwise would to open up an already complex litigation to the laws of countless states or localities.

In addition, while plaintiffs have proposed a class that consists of children eight and under, the local and federal law they have cited and even their own expert on lead in children, Dr. John F. Rosen ("Rosen"), describes the serious risk of lead exposure to children under 7 years old. The only reference Rosen makes to children over six is that "[e]nvironmental factors may cause older children to be at risk also." Rosen Aff. ¶ 13. There is no further discussion to indicate if any or all of these children are exposed to such environmental factors. The class will include children under seven.

The plaintiffs have offered no support for including women of child bearing years. Rosen cites the increased risk of miscarriage and birth defects of the children born to pregnant women who ingest lead. Rosen aff. ¶ 21, ¶ 33. Having alleged no harm or threatened harm to women of childbearing years, except for those who are pregnant, injunctive relief on behalf of the class as a whole is not appropriate. The class of pregnant women living in these dwellings has no representative, however, and thus cannot be certified at this time.

The classes certified will include "children under seven years old residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program." While the Court agrees that as a practical matter, notice of the risks and signs of lead paint problems will need to be sent to all tenants to insure that those at risk of injury are notified, the class can only contain those at risk. The sub-class for Medical Monitoring will include the modification that there must be the risk of lead-based paint, consistent with the statutes, including the statutory presumptions. The remainder of the class definitions requested by plaintiffs will remain as requested by plaintiffs and as described herein.

## II. The Court Will Not Abstain Under Either the Colorado or the Burford Abstention Doctrines

The City of New York has suggested that abstention under either the *Colorado River* or *Burford* extension would be appropriate given the facts of this case. For the reasons discussed below, this Court will not abstain.

### Burford Abstention

■ The *Burford* doctrine requires federal courts to abstain from deciding questions of state law when federal review would disrupt a state's efforts to establish a coherent policy on a matter of substantial importance to the state. See *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Sheerbonnet v. American Express Bank Ltd.*, 17 F.3d 46, 48 (2d Cir.1994); *City of Hartford v. Chase*, 942 F.2d 130, 136 (2d Cir.1991); *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir.1988).

In *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Supreme Court capsulized the principles underlying the Burford doctrine:

> Where timely and adequate state-court review is available, a federal court * * * must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing upon public problems of substantial public import whose importance transcends the result in the case at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Id.* at 361, 109 S.Ct. at 2514 (*quoting Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244).

Recently, in *Sheerbonnet*, the Court of Appeals cautioned that the mere existence of concurrent state and federal actions concerning similar matters is not enough to warrant abstention. "Where * * * a federal court properly has subject matter jurisdiction, it has a 'virtually unflagging obligation' to exercise that jurisdiction, even if an action con-

cerning the same matter is pending in state court." *Sheerbonnet,* 17 F.3d at 49, *quoting Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.,* 800 F.2d 325, 327 (2d Cir.1986) (internal quotations omitted); *see New Orleans Pub. Serv., Inc.,* 491 U.S. at 362, 109 S.Ct. at 2515 ("While Burford is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy.") (*quoting Colorado River,* 424 U.S. at 815–16, 96 S.Ct. at 1245–46).

■ Given the "heavy presumption favoring the exercise of jurisdiction", *Law Enforcement Ins. Co. v. Corcoran,* 807 F.2d 38, 40–41 (2d Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987), and the lack of any state regulatory or judicial proceeding addressing these same issues and the central role that Congress has established for itself in this arena, there is no need for abstention in this instance. Additionally, *NYCCELP v. Koch* is not a case primarily about the liabilities or duties of building owners or of the housing authorities under the LPPPA. These issues form the basis of this case and are distinguishable. Additionally, the presence of Freddie Mac, a federally created entity, and NYCHA, not a party to the state action, further distinguish this case.

This case does not present particularly "difficult issue of state law, the resolution of which will have a significant impact on important state policies ...," *Alliance,* 854 F.2d at 599, nor does this case "involve federal courts in supervising, interrupting, or meddling in state policies by interfering in state regulatory matters." *Id.* at 601.

While there are City efforts afoot, as described in the City papers, to rectify the problems of lead paint in multiple dwelling units, the efforts over decades have not eradicated the problem. There is also substantial federal interest in addressing this serious issue of national importance. *See LPPPA;* 42 U.S.C. § 4851.

In light of the differences between the state and federal cases and the magnitude of the federal concern in this area, abstention under *Burford* is not required.

The City also urges that this Court should abstain under the *Colorado River* abstention doctrine.

### *Colorado River Abstention*

■ In *Colorado River,* the Supreme Court held that a federal court could, in exceptional circumstances, abstain where there are concurrent state and federal proceedings. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The "exceptional circumstances" necessary for abstaining under Colorado River requires the balancing of six factors which are reviewed in *De Cisneros v. Younger,* 871 F.2d 305, 307 (2d Cir.1989) and include the following:

1. assumption of jurisdiction over a *res;*
2. inconvenience of the forum;
3. avoidance of piecemeal litigation;
4. order in which the actions were filed;
5. the law that provides the rule of decision;
6. protection of the federal plaintiff's rights.

■ The Court of Appeals reminds us that the balance should be heavily weighted in favor of the exercise of jurisdiction. *De Cisneros,* 871 F.2d at 307; *See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983).

■ In fact, a review of these factors is hardly necessary because the state and federal proceedings here are not "concurrent" in the manner required by the Colorado River doctrine. *See Sheerbonnet,* 17 F.3d at 50; *Alliance of Am. Insurers,* 854 F.2d at 603 (some overlap of subject matter not enough to make state and federal actions concurrent); *Telesco v. Telesco Fuel and Masons' Materials, Inc.,* 765 F.2d 356, 362 (2d Cir. 1985) (Colorado River Abstention upheld where federal and state actions were "essentially the same").

The state case at issue here is *New York City Coalition to End Lead Poisoning v.*

*Koch,* 138 Misc.2d 188, 524 N.Y.S.2d 314 (N.Y.Sup.Ct.1987) which is described above.

First, the two proceedings involve different parties. "Similarity of parties is not the same as identity of parties." *Alliance of Am. Insurers,* 854 F.2d at 603. The Germans and the Goffins are not participants in the state action, nor is NYCHA or the 1710 defendants or any other of the individual owner and manager defendants implicated in the individual claims by the named plaintiffs.

Secondly, the proceedings involve different subject matters and different forms of relief. As noted in the previous section, the issues presented here include the duty of owners and the duty of the NYCHA as a public housing authority. NYCHA is not a party to the state court action.

Even if the proceedings were concurrent, a review of the factors does not dictate abstention under this doctrine.

The first two factors are not implicated in this case, but the absence of jurisdiction over a *res* and the convenience of the federal forum both point toward exercise of federal jurisdiction. *De Cisneros,* 871 F.2d at 307; *See Bethlehem Contracting Co. v. Lehrer/McGovern Inc.,* 800 F.2d 325, 327 (2d Cir.1986).

Since the parties are different as are some of the issues, this litigation would not tend to produce piecemeal litigation.

The state litigation was without question filed first. This alone, however, does not require abstention.

As to the fifth factor, there are questions of state and federal law involved in this action. The duties of both NYCHA and the City under the LPPPA form an important part of this litigation and thus the state law does not provide the sole rule of decision.

Finally, there are no federal plaintiffs in this action. There is, however, a federal defendant who sought to have this case removed to the federal court for adjudication of the claims against it.

A review of these factors does not counsel abstention. As the Court explained in *Moses H. Cone:*

> When a district court decides to dismiss or stay under *Colorado River,* it presumably concludes that the parallel state court litigation will be an adequate vehicle for *complete* and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismiss at all....

460 U.S. at 28, 103 S.Ct. at 943 (emphasis added).

Since the state case involves different parties and different issues, abstention under *Colorado River* is not required.

The Supreme Court reiterated that a federal court's obligation to adjudicate claims within its jurisdiction is "virtually unflagging" and that abstention remains " 'the exception, not the rule.' " *New Orleans Public Serv., Inc.,* 491 U.S. at 359, 109 S.Ct. at 2513 (*quoting Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988), and *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)). Accordingly, this is not an appropriate case for either Burford or Colorado abstention.

This being said, we shall turn to the defendants' motions to dismiss and for summary judgment on the individual claims in this action.

### III. *Motions to Dismiss and for Summary Judgment*

### A. *The Defendants' Motions*

The 1710 defendants have moved to dismiss all claims in plaintiffs' second amended complaint for equitable relief and to dismiss the third, fifth, seventh, ninth, eleventh, thirteenth and fifteenth causes of action on 12(b)(6) grounds for failure to state a claim upon which relief can be granted. Finally the 1710 defendants ask the Court, pursuant to 12(f) to dismiss the plaintiffs' complaint or to strike the extraneous, argumentative and duplicative matters they claim are contained in the first fifty-five paragraphs of the complaint.

The Freddie Mac defendants move for an order to 1) dismiss all claims for equitable relief against the moving defendants; 2) dismissing claims three through eighteen; 3)

granting defendants partial summary judgment on all equitable claims; 4) dismissing all claims against Tebec; 5) and striking that portion of the plaintiffs' Second Amended Complaint incorporating by reference their First Amended and Intervening Complaints.

The City moves for an order 1) dismissing the complaint in so far as it seeks equitable relief against the City; and 2) dismissing claims five, seven, thirteen and seventeen.

NYCHA moves for an order 1) dismissing the common law tort claims for failure to serve a timely notice of claim on NYCHA; 2) dismissing the action for failure to state a claim; 3) dismissing the action for failure to join an indispensable party, the United States Department of Housing and Urban Development ("HUD").

### B. Standard for Motions to Dismiss (Rule 12(b)(6))

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. See *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Plaintiffs' Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 250–51, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

### C. Motions for Summary Judgment

#### Standards Applicable to a Motion for Summary Judgment

A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). The moving party bears the burden of proving that no genuine issue of material fact exists. *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *Pittston Warehouse Corp. v. American Motorists Ins. Co.*, 715 F.Supp. 1221, 1224 (S.D.N.Y.1989), aff'd, 954 F.2d 62 (2d Cir.1992).

The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady*, 863 F.2d at 210; *see also Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York*, 716 F.2d 982, 983–84 (2d Cir.1983); *Swan Brewery Co. v. United States Trust Co.*, 832 F.Supp. 714, 717 (S.D.N.Y.1993).

The remedy of summary judgment is viewed "as an integral part of the Federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citations omitted). Once the moving party has met its burden of coming forward with evidence to show that no material fact exists for trial, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### D. Statutory Framework

#### Local Laws

Plaintiffs allege violations of numerous sections of the New York City administrative Code as follows:

New York City Administrative Code § 27–2013(h) requires and has required, since 1982, that:

(1) The owner of a multiple dwelling shall remove or cover in a manner approved by the department (of Housing Preservation**) any paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside.

(2) In any multiple dwelling erected prior to January First, Nineteen Hundred Sixty in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than the 0.5 percent of metallic lead based on the nonvolatile content of the paint or other similar surface coating material or have a reading of 0.7 milligrams of lead per square centimeter or greater.

(3) The existence of paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside shall constitute a class C immediately hazardous violation and subject the owner of such multiple dwelling unit to the penalties for such violation provided in article two of this subdivision may be rebutted by the owner of the multiple dwelling. Such proof shall be in form and substance acceptable to the department or a court of competent jurisdiction.

... (4) The department shall establish procedures for the enforcement of this subdivision.

Title 27, Chapter 2—Housing and Maintenance Code, § 27–2013(h).

Pertinent parts of §§ 27–127 and 27–128 of the New York Administrative Code are as follows:

§ **27–127 Maintenance requirements.** All buildings and all parts thereof shall be maintained in a safe condition. . . .

§ **27–128 Owner responsibility.** The owner shall be responsible at all times for the safe maintenance of the building and its facilities.

Section 27–2115(c) describes the time-frames within which violations of the housing standards must be corrected upon notice from the Department of Housing Preservation.

Section 17–142 of the New York City Administrative Code states that:

... The word "nuisance," shall be held to embrace public nuisance, as known at common law or in equity jurisprudence; whatever is dangerous to human life or detrimental to health; whatever building or erection, or part of cellar thereof, is overcrowded with occupants, or is not provided with adequate ingress and egress to and from the same or the apartments thereof, or is not sufficiently supported, ventilated, sewered, drained, cleaned or lighted in reference to its intended or actual use. . . . All such nuisances are hereby declared illegal.

*State Laws*

**New York Multiple Dwelling Law § 78** (McKinney 1974) in pertinent part, reads:

*Repairs*

1. Every multiple dwelling, including its roof or roofs, and every part thereof and the lot upon which it is situated, shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section; but the tenant also shall be liable if a violation is caused by his own wilful act, assistance or negligence or that of any member of

his family or household or his guest. Any such persons who shall wilfully violate or assist in violating any provision of this section shall also jointly and severally be subject to the civil penalties provided in section three hundred four.

**New York Multiple Dwelling Law § 309** (McKinney 1974 & Supp.1995), in pertinent part, reads:

*Repairs, vacation and demolition of buildings*

1. a. The term "nuisance" shall be held to embrace public nuisance as known at common law or in equity jurisprudence. Whatever is dangerous to human life or detrimental to health, and whatever dwelling is overcrowded with occupants or is not provided with adequate ingress and egress or is not sufficiently supported, ventilated, sewered, drained, cleaned, or lighted in reference to its intended or actual use, and whatever renders the air or human food or drink unwholesome, are also severally, in contemplation of this law, nuisances. All such nuisances are unlawful....

**New York Real Property Law § 235–b, Warranty of habitability:**

1. In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. When any such condition has been caused by the misconduct of the tenant or lessee or persons under his direction or control, it shall not constitute a breach of such covenants and warranties.

2. Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy.

3. In determining the amount of damages sustained by a tenant as a result of a breach of the warranty set forth in the section the court;

(a) need not require any expert testimony; and

(b) shall, to the extent the warranty is breached or cannot be cured by reason of a strike or other labor dispute which is not caused primarily by the individual landlord or lessor and such damages are attributable to such strike, exclude recovery to such extent, except to the extent of the net savings, if any, to the landlord or lessor by reason of such strike or labor dispute allocable to the tenant's premises, provided, however, that the landlord or lesser ... has made a good faith attempt, where practicable, to cure the breach.

The relevant federal statutes and regulations are described below in the section regarding federal claims.

### E. *The Motions to Dismiss the Negligence Per se Claims are Granted*

The New York City Administrative Code is a statutory scheme that defines the duties of the landlord and tenant concerning property in New York City. *Guzman v. Haven Plaza Housing Development Fund Co.*, 69 N.Y.2d 559, 565–67, 516 N.Y.S.2d 451, 509 N.E.2d 51 (1987). The Administrative Code "has all the force of a statute in the City of New York." *Id.* at 565 n. 3, 516 N.Y.S.2d 451, 509 N.E.2d 51 (quoting *Hart v. City Theatres Co.*, 215 N.Y. 322, 326, 109 N.E. 497 (1915)).

In *Guzman v. Haven Plaza*, one of the defendants, the owner of the premises where plaintiff Guzman had fallen, made the very same contention as defendants here: "that the New York City Administrative Code has only the force of an ordinance and that absent a duty imposed by statute there could be no liability." *Guzman v. Haven Plaza*[11], 69 N.Y.2d at 567 n. 4, 516 N.Y.S.2d 451, 509

---

**11.** It should also be noted that the right to reentry provisions found in the plaintiffs' leases, as quoted by plaintiffs, leave open the possibility of constructive notice that is discussed in great length in this line of cases, all distinctions aside.

N.E.2d 51. The Court of Appeals responded: "Because the Administrative Code provision has the force of a statute, the controlling decisions are *Worth Distribs. v. Latham,* 59 N.Y.2d 231 [464 N.Y.S.2d 435, 451 N.E.2d 193 (1983) ] and *Tkach v. Montefiore Hosp.,* 289 N.Y. 387 [46 N.E.2d 333 (1943) ]" *Guzman v. Haven Plaza,* 69 N.Y.2d at 567 n. 4, 516 N.Y.S.2d 451, 509 N.E.2d 51 which all treat the Code as having the status of a statute. These cases, which are pointed to by plaintiffs, however, have not held that violation of the Administrative Code is grounds for finding negligence *per se.*

 Violation of a statute does not necessarily constitute negligence *per se. See Gain v. Eastern Reinforcing Service, Inc.,* 193 A.D.2d 255, 603 N.Y.S.2d 189, 191 (3rd Dep't 1993). As the *Gain* court noted:

> While, concededly, a statute which does not impose a civil remedy for its violation may indeed be recognized as impliedly creating a statutory standard of care, whether such will be imposed in a particular case devolves into a question of legislative intent; more specifically, whether the underlying policy of the legislation is the protection of a certain class of individuals and whether judicial recognition of a statutory standard will further that policy of protection.

*Id.,* 193 A.D.2d at 258–59, 603 N.Y.S.2d 189.

 Having been provided with no support for the proposition that the relevant sections of the Administrative Code were to impose standards imposing, in their violation, negligence *per se* and finding no New York authority for this proposition in the case of the New York City Administrative Code, the motion to dismiss these claims is granted. The alleged violations of the Code, if proved, would be evidence of negligence.

The motions to dismiss the claims are granted.

### F. Breach of Implied Warranty of Habitability Claims Will not be Dismissed

Plaintiffs' sixth and seventh causes of action are for breach of contract and implied warranty of habitability. Specifically, plaintiffs allege that the apartments they rent from the defendants—the current and predecessor owners of the premises—contain lead paint and, therefore, threaten the plaintiffs' health and safety and are unsuitable for human habitation. Defendants maintain that the warranty of habitability is not a cognizant legal theory upon which recovery for personal injuries may be sought. With regard to injunctive relief, defendants contend that it is unavailable against defendants—City of New York, Freddie Mac, Caisi, and Tebec because plaintiffs no longer have a contractual relationship with them. Finally, defendant City of New York contends that as a municipality, it is not subject to punitive damages.

With the passage in 1975 of New York Real Property Law § 235–b, all residential leases were imbued with an implied warranty of habitability. Under New York law "[a] residential lease is now effectively deemed a sale of shelter and services by the landlord, who impliedly warrants: first, that the premises are fit for human habitation; second, that the condition of the premises is in accord with the uses reasonably intended by the parties; and third, that the tenants are not subjected to any conditions endangering or detrimental to their life, health, or safety." *Park West Management Corp. v. Mitchell,* 47 N.Y.2d 316, 418 N.Y.S.2d 310, 315, 391 N.E.2d 1288, 1293 (Ct.App.), *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); N.Y. Real Property Law § 235–b (McKinney's 1989).

 It is well settled that section 235–b provides tenants with a cause of action sounding in breach of contract. *Park West Management Corp.,* 418 N.Y.S.2d at 315, 391 N.E.2d at 1292–93; *Segal v. Justice Court Mutual Housing Cooperative, Inc.,* 105 Misc.2d 453, 432 N.Y.S.2d 463, 465–67 (Queens County 1980), *aff'd,* 108 Misc.2d 1074, 442 N.Y.S.2d 686 (App.Term 1981); *Pezzolanella v. Galloway,* 132 Misc.2d 429, 503 N.Y.S.2d 990, 993 (Oneida County 1986); *Mahlmann v. Yelverton,* 109 Misc.2d 127, 439 N.Y.S.2d 568, 570 (Queens County 1980). However, as defendants adequately contend, it does not impose strict liability upon a landlord for personal injuries sustained by a

tenant as a result of a condition or defect in the premises. *Segal*, 432 N.Y.S.2d at 466 (action based on strict liability for breach warranty of habitability, seeking to recover for injuries sustained from falling kitchen cabinet, dismissed); *Hamel*, 431 N.Y.S.2d at 771 (action based on strict liability for breach warranty of habitability, seeking to recover for injuries sustained when balcony railing collapsed, dismissed); *Mahlmann*, 439 N.Y.S.2d at 571 (action based on strict liability for warranty of habitability, seeking to recover for injuries sustained from lead contained in painted walls, dismissed); *see also Curry v. City of New York Housing Authority*, 77 A.D.2d 534, 430 N.Y.S.2d 305, 306–307 (1st Dept.1980) (refusing to impute strict liability to warranty of habitability where child fell out of an unguarded window). A tenant seeking to recover from his or her landlord for personal injuries sustained as a result of a defect in the apartment must rely upon traditional theories of tort liability, which require proof of negligence or knowledge, either actual or constructive, of the defective condition. *Pezzolanella v. Galloway*, 503 N.Y.S.2d at 992; *Mahlmann*, 439 N.Y.S.2d at 570; *Hamel*, 431 N.Y.S.2d at 771. To the extent that plaintiffs may have been seeking to recover for their alleged personal injuries, their cause of action does not lie in a claim for breach of the implied warranty of habitability.

▄ Nevertheless, plaintiffs may maintain a cause of action for breach of the implied warranty of habitability under a theory of breach of contract. The most frequently applied measure of damages for this sort of breach is rent abatement. *Park West Management Corp. v. Mitchell*, 62 A.D.2d 291, 404 N.Y.S.2d 115, 119 (1st Dept.1978) (quoting Senator H. Douglas Barclay, Sen.J. 7771), *aff'd*, 47 N.Y.2d 316, 418 N.Y.S.2d 310, 391 N.E.2d 1288, *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *Segal*, 432 N.Y.S.2d at 465. However, as it is a breach of contract, a court, in fashioning a relief for the breach of the implied warranty of habitability, is free to consider "the full range of remedies in contract law.... in-

clud[ing] damages, specific performance and recision." *Park West Management Corp. v. Mitchell*, 62 A.D.2d 291, 404 N.Y.S.2d 115, 119 (1st Dept.1978) (quoting 1975 Sen.J. 7771–remarks of Sen. H. Douglas Barclay), *aff'd*, 47 N.Y.2d 316, 418 N.Y.S.2d 310, 391 N.E.2d 1288, *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *Segal*, 432 N.Y.S.2d at 465. In *Park West Management Corp. v. Mitchell*, the New York Court of Appeals directly addressed the issue of rent abatement for the breach of the implied warranty of habitability, but was circumspect in not officially addressing other possible remedies. 418 N.Y.S.2d at 317, 391 N.E.2d at 1288 ("We do not comment upon the availability of other remedies not implicated under the facts presented here.").

Since *Park West*, New York courts have been willing to award punitive damages for particularly egregious breaches of the implied warranty of habitability.[12] *See, e.g., Minjak Co. v. Randolph*, 140 A.D.2d 245, 528 N.Y.S.2d 554 (1st Dept.1988) (upholding award of punitive damages for performing repairs without regard for tenants' safety); *111 East 88th Partners v. Simon*, 106 Misc.2d 693, 434 N.Y.S.2d 886 (New York County 1980) (awarding punitive damages for clear pattern of withholding services in breach of the implied warranty of habitability). This relief, however, is not available against defendant-City of New York because "[d]amages awarded for punitive purposes ... are not sensibly assessed against [a] governmental entity." *City of Newport v. Fact Concerts*, 453 U.S. 247, 267, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981); *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 452 N.Y.S.2d 347, 351, 437 N.E.2d 1104, 1108 (Ct.App.1982).

▄ Finally, it is apparent from *Bartley v.* Walentas, that injunctive relief may be an appropriate remedy "[w]here the landlord's breach of habitability is continuous and drastic." 78 A.D.2d 310, 434 N.Y.S.2d 379, 383 (1st Dept.1980). The Germans, however, may not seek this remedy, against City of New York. By the time plaintiffs brought this suit City of New York no longer owned

---

**12.** Defendants have not asserted that their breach of the implied warranty of habitability is

not sufficiently serious and wanton to justify punitive damages.

plaintiffs' apartments, leaving plaintiffs without a real and immediate threat of being harmed by City of New York in the future. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983). Plaintiffs as class representatives may, however, seek injunctive relief against the remaining defendants, including Freddie Mac, Caisi, and Tebeck for their breach of the implied warranty of habitability.

The individual plaintiffs may seek rent abatement from all defendants on the theory of breach of an implied warranty of habitability; and they may seek punitive damages against all defendants except the City of New York on this theory. Defendants motion to dismiss is granted in part and denied in part, consistent with the above discussion.

### G. *Strict Products Liability*

Plaintiffs' seventh and eighth causes of action sound in strict products liability, for the alleged rental by the landlord of an inherently dangerous apartment. Defendants contend plaintiffs' cause of action for strict products liability should be dismissed as improperly pled and not actionable as a matter of law.

 Under traditional common-law doctrines, a lease was not regarded as a set of mutually dependent promises effecting a contract for sale. Instead it was understood to be a conveyance of an estate for a set term; thus, it was subject to the unique dictates of property law. *See Powell on Real Property* § 16.02[1] at 16–8. (Karen Anderson, rev. 1994); *Samuel Williston, A Treatise on the Law of Contracts* § 890 at 587–88 (Walter H.E. Jaeger, ed., 3d ed., 1962); *see also Park West Management Corp.,* 418 N.Y.S.2d at 313, 391 N.E.2d at 1291. "Consequently, the duty imposed upon the lessor was satisfied when the legal right of possession was delivered to the lessee." *Park West Management Corp.,* 418 N.Y.S.2d at 313, 391 N.E.2d at 1291. However, the modern trend has been to analogize leases to contracts, so that "[a] residential lease is now *effectively deemed* a sale of shelter and services by the landlord...." *Id.* at 315, 391 N.E.2d at 1293 (emphasis added). Nevertheless, the cases establishing the lease-as-contract analogy, as well as the statutes codifying this recharacterization, do not hint of any purpose or intention to extend the doctrine of strict products liability to landlords with regard to traditional torts. *See Curry,* 430 N.Y.S.2d at 307. Landlords are not insurers of their tenants' safety. In this regard, the law in New York is well established: "To hold a landlord liable for a defective condition upon the premises, a plaintiff must show that the landlord had either actual or constructive notice of the condition for a sufficient period of time to have corrected it." *DeMarco v. Bansal,* 826 F.Supp. 785, 787 (S.D.N.Y.1993) (summary judgment for landlord granted where tenant-child was injured by unsecured bird bath); *Appleby v. Webb,* 186 A.D.2d 1078, 588 N.Y.S.2d 228 (4th Dept. 1992).

 Plaintiffs are unable to cite a single case in which a tenant was permitted to bring a suit for strict products liability against a landlord and there is simply no indication that the courts of the State of New York courts are moving in a direction towards recognizing such a claim. Plaintiffs' reliance on *Inman v. Binghamton Housing Authority,* 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895 (1957) is misplaced. *Inman* merely addressed the availability of a strict products liability claim against an architect and a builder for the faulty planning and construction of a stoop. *Id.* at 146, 164 N.Y.S.2d 699, 143 N.E.2d 895 ("There is no visible reason for any distinction between the liability of one who supplies a chattel and one who *erects* a structure." (emphasis added)). Conspicuously, the cause of action against the building owner in that case was simply for negligence. *Id.* at 146, 164 N.Y.S.2d 699, 143 N.E.2d 895 ("According to the complaint of the Inmans against the [landlord], the injuries were owing to ... negligence ... in the construction maintenance and continuance of an allegedly known defective condition of the premises."). In fact, plaintiffs' reading of *Inman,* as recognizing the availability of strict products liability claim against a building owner, was recently expressly rejected by a New York Appellate Division court. *Serna v. New York State Urban Development Corp.,* 185 A.D.2d 562,

586 N.Y.S.2d 413, 414 (3d Dept.1992) ("In our view, such an expansive reading of *Inman* is inadvisable.").

The claims based on product liability are dismissed.

### H. Motions to Dismiss Ultrahazardous Claims Will be Granted

The Second Amended Complaint's tenth and eleventh causes of action, allege strict liability for ultrahazardous substances.

■ New York has adopted the six factors enumerated in the Restatement of Torts 2nd (§ 520) to determine whether or not an activity is abnormally dangerous or ultrahazardous, thus giving rise to strict liability. *Doundoulakis v. Town of Hempstead*, 42 NY.2d 440, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1997). These factors are as follows:

1. Existence of a high degree of risk of some harm to the person, land or chattels of others;

2. Likelihood that the harm that results from it will be great;

3. Inability to eliminate the risk by the exercise of reasonable care;

4. Extent to which the activity is not a matter of common usage;

5. Inappropriateness of the activity to the place where it is carried on;

6. Extent to which its value to the community is outweighed by its dangerous attributes.

*Doundoulakis*, 42 N.Y.2d at 448, 398 N.Y.S.2d 401, 368 N.E.2d 24.

■ Most useful for purposes of analyzing plaintiffs' claim is whether the risk from the activity is able to be eliminated by the exercise of reasonable care. *Doundoulakis*, 42 N.Y.2d 440, 398 N.Y.S.2d 401, 404, 368 N.E.2d 24, 26–27. Plaintiffs implicitly admit that lead paint can be controlled "by removing it or permanently, durably, impermeably, and impenetrably covering it." The fact that this can be controlled with reasonable care, and absent any controlling New York precedent that would direct otherwise, the claims for ultra-hazardous substances must be dismissed. *See National R.R. Passenger Corp.*

*v. New York City Hous. Auth.*, 819 F.Supp. 1271, 1279 (S.D.N.Y.1993).

### I. Nuisance

■ The elements of a private nuisance in New York are: (1) an interference substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act. *Copart Industries, Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 173, 362 N.E.2d 968, 971 (1977) (citations omitted); *Bower v. Weisman*, 639 F.Supp. 532, 541 (S.D.N.Y.1986) (adopting *Copart* as the defining case).

■ An action for private nuisance cannot be sustained without a showing of damages. "The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct." Prosser & Keeton, *supra*, § 87 at 623. "The law does not concern itself with trifles and there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or private nuisance." Restatement (Second) of Torts § 821F, comment c.

■ Nuisance is not simply negligence. *Copart*, 41 N.Y.2d at 568, 394 N.Y.S.2d 169, 362 N.E.2d 968, describes the difference between the two concepts: "nuisance . . . describes the consequences of conduct, the inconvenience to others rather than the type of conduct involved. . . . It is a field of tort liability, rather than a single type of tortious conduct. . . ." *Copart*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968. *Copart* describes that:

. . . one is subject to liability for private nuisance if his conduct is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities
. . .

*Id.* at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968.

■ "An invasion of another's interest in the use and enjoyment of land is intentional

when the actor ... knows that it is ... substantially certain to result from his conduct...." *Id.* at 571, 394 N.Y.S.2d 169, 362 N.E.2d 968 (citations omitted). *See also State v. Fermenta ASC Corp.,* 160 Misc.2d 187, 608 N.Y.S.2d 980, 985 (Sup.Ct.Suffolk Co.1994). The law in New York is clear that unabated or controlled lead-paint in dwelling units housing children under 7 years of age is hazardous to the health of the children.

Plaintiffs allege a cause of action for both private and public nuisance by pleading that the lead contamination has created "an unreasonable invasion of their living conditions" and is "defined as an unlawful nuisance in violation of the New York City Administrative Code and Health Code." 2d Am.Compl. ¶¶ 90, 94. Plaintiffs claim that defendants invaded and interfered with plaintiffs' use and enjoyment of the residence they rented from defendants by exposing plaintiffs to lead paint and increased, unacceptable, abnormal danger of lead poisoning. 2d Am. Compl. ¶¶ 82, 86, 89, 91, 93, 95. They state that defendants have provided an apartment to plaintiffs, intended and used as their residence, that is detrimental to their health, where lead contamination is not sufficiently cleaned up and lead paint cracks, scales, chips, and peels, is rubbed, banged, and otherwise abraded, and spews flakes and dust into the air. *See* Rosen Decl. ¶¶ 20, 24, 25, 41, 42. Plaintiffs allege this interference was not only unreasonable, but intentional, reckless, and negligent, as well as in violation of controlling laws. 2d Am.Compl. ¶¶ 45–47, 55–62, 90, 94. Plaintiffs have alleged sufficiently the elements of nuisance, such that a 12(b)(6) motion cannot be granted. While nuisance based on negligence is subsumed under the claim for negligence, allegations of intentional nuisance are not.

Finally, it remains a question of fact as to whether or not each of the defendants who has subsequently sold the properties in question can be held liable for creating the nuisance *See Wilks v. New York Tele. Co.,* 243 N.Y. 351, 360, 153 N.E. 444 (1926), or for creating or maintaining an absolute nuisance. *See Penn. Central Transp. v. Singer Warehouse & Trucking Corp.,* 86 A.D.2d 826, 447 N.Y.S.2d 265 (1st Dep't 1982). This cannot be resolved on a motion to dismiss.

### J. *The Motion to Dismiss the Intentional Infliction of Mental Distress is Denied*

■ New York, which uses the Restatement (2d) of Torts definition of intentional infliction of emotional distress, requires that the conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Fischer v. Maloney,* 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1217 (1978) (quoting Restatement (2d) Torts § 46(1)). In pertinent part, *Fischer* stated that the requirements in New York for a action for intentional infliction of mental distress required:

(1) conduct exceeding all bounds usually tolerated by decent society; or

(2) extreme and outrageous conduct ... which intentionally or recklessly causes *severe* emotional distress to another; or

(3) (a combination of the two) extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.

■ The conduct must also be intentionally directed at the plaintiff and lack any reasonable justification. *Martin v. Citibank,* 762 F.2d 212, 220 (2d Cir.1985).

■ Plaintiffs allege defendants' conduct was knowing, wilful, and intentional: defendants knew that plaintiffs' residences would expose plaintiffs to lead, causing them physical and mental injuries, indeed that lead poisoning and its risks would cause any parent, guardian, or custodian of a young child to "suffer *severe* emotional distress, including ongoing concern for and fear of the children's safety." 2d Am.Compl. ¶¶ 99, 103. *See also id.* ¶¶ 45, 97–98, 100–102, 104; Rosen Decl. ¶¶ 54, 55. Plaintiffs allege that defendants knew that federal and local law required defendants to maintain their residential buildings such that plaintiffs would not be lead poisoned and that in the face of these facts, defendants' failure to prevent, abate, or

even warn plaintiffs of the hazards or otherwise stop plaintiffs' ongoing exposure was "egregious," "outrageous," "unacceptable," "unnecessary," and "wanton." *Id.* ¶¶ 45, 46, 97, 99, 101, 103. *See also* Rosen Decl. ¶¶ 55, 56.

Further, plaintiffs allege that defendants provided and maintained housing for plaintiffs that was not "suitable for human habitation," posed an "imminent threat" to their safety and health, and was "inherently dangerous." 2d Am.Compl. ¶¶ 70, 71, 73, 74, 76, 79, 97, 101. The housing defendants provided exposed plaintiffs to lead, "which is known to be a highly toxic substance to children.... The toxicity of lead to children is so well known that ... the exposure to lead [is] prohibited." 2d Am.Compl. ¶ 82. *See also* ¶¶ 86, 97, 101.

These allegations are equivalent to "intolerable," "indecent," and "atrocious," or "extreme," or "reckless." *See* Rosen Decl. ¶¶ 25, 26, 54–56. Nevertheless, this court has made clear that:

> It will be for the trier of fact to determine whether defendants' conduct went beyond all reasonable bounds of decency ... that such conduct was "outrageous."

*Bower v. Weisman,* 639 F.Supp. at 541 (citations omitted).

The case cited by defendants, *Pierre v. Pierce,* 741 F.Supp. 306 (D.Mass.1990), to support dismissal of this case is distinguishable. In that case, unlike the case at hand, the defendant seller was under no duty under Massachusetts law to warrant the house it sold to the plaintiff as habitable for the plaintiff's child. At the time the house was sold to Ms. Pierre she had no children. Additionally, the Massachusetts court found that the applicable statute "places a duty to remove the lead paint on the new owner, not the vendor." *Id.,* 741 F.Supp. at 313 (1986).

Here, New York State and City laws explicitly place that same duty on the owner of a multiple dwelling renting the dwelling to tenants. Defendants were charged with notice of the injury causing defects on the premises that they, as landlord and its agents, warranted as habitable for the young plaintiff children. *E.g.,* RPL § 235–b; MDL §§ 78, 309(1)(a); N.Y.C.Admin.Code §§ 27–127, 27–128, 27–2013(h), 27–2115(c). Plaintiffs allege that the defendants ignored the defects and that those defects then injured plaintiffs.

Plaintiffs have plead this cause of action sufficiently such that the motions to dismiss on 12(b)(6) grounds are denied.

### K. *Motion to Dismiss Claim for Negligent Infliction of Emotional Distress is Denied*

The standards for negligent infliction of emotional distress are set forth in *Bovsun v. Sanperi,* 61 N.Y.2d 219, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984). To state a cause of action, plaintiffs must allege the following elements:

1) that defendant was negligent in creating an unreasonable risk of bodily harm to the plaintiff;

2) that such conduct was a substantial factor in bringing about injuries to the plaintiffs; and

3) that the injuries are a consequence resulting from plaintiff's contemporaneous observation of serious physical injury or death inflicted by defendant's conduct on a member of plaintiff's immediate family in his or her presence.

*Bovsun,* 61 N.Y.2d at 223–24, 473 N.Y.S.2d 357, 461 N.E.2d 843.

While physical injury is no longer a necessary element, a cause of action to recover damages for negligent infliction of emotional distress must generally be premised upon conduct which "unreasonably endangers" the plaintiff's physical safety. The New York cases cited by plaintiffs and defendants, in as much as they shed light on the "unreasonable risk of bodily harm requirement," indicate that while recovery is available for emotional injuries, there still must be an allegation that there was risk of bodily harm to the plaintiffs, in this case the mothers. *See De Rosa v. Michelman,* 184 A.D.2d 490, 584 N.Y.S.2d 202 (2d Dep't 1992); *Lancellotti v. Howard,* 155 A.D.2d 588, 547 N.Y.S.2d 654 (2d Dep't 1989); *Callas v. Eisenberg,* 192 A.D.2d 349, 595 N.Y.S.2d 775 (1st Dep't 1993). In another line of cases,

the New York Courts have also allowed the claim for negligent infliction to proceed where the observer/plaintiff alleges a breach of duty owed to the plaintiff (in this case the plaintiff mothers) by the defendant. *See Kennedy v. McKesson,* 58 N.Y.2d 500, 504–05, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983). In either case, plaintiffs allege that lead poses a serious danger to the physical safety of women of child bearing years.

■ Under the strict standards of review for a motion to dismiss, the elements of this claim have been alleged and the claim will not be dismissed.

### L. *There is a Cause of Action under LPPPA against Public Housing Authorities*

The final causes of action alleged by plaintiffs are against the City of New York and NYCHA in their capacity as public housing authorities that administer federal funds to the dwelling units where plaintiffs reside.

As a PHA using federal funds in the CDBG program, the City (HPD), is responsible for compliance to eliminate lead paint hazards in housing assisted under the federal CDBG program.

Defendant NYCHA, as a local housing authority that makes housing assistance payments on behalf of eligible families leasing existing housing under Section 8, is responsible for compliance with the regulations for PHA leased housing. 24 C.F.R. pt. 882.

Plaintiffs claim a cause of action directly under the LPPPA and pursuant to 42 U.S.C. § 1983.

### 1. *Section 1983 Confers a Federal Right of Action Against the PHA's*

Section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110

S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990) (quoting 42 U.S.C. § 1983)[13].

■ While Section 1983 can be used to remedy violations of federal statutes as well as the Constitution, *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2516–17 (citing *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980)), violation of a federal statute does not always give rise to a cause of action under § 1983. *Id.* When alleging violation of a federal statute, a plaintiff is not allowed to sue under § 1983 if: (1) "the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983"; or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). The presumption is in favor of a right to sue. *Chan v. City of New York,* 1 F.3d 96, 103 (2d Cir.1993).

#### a. *Enforceable Rights*

#### i. *The Standards for Determining Whether an Enforceable Right Exists*

In determining whether a statute creates a right, privilege or immunity enforceable under § 1983, the Court of Appeals first applies the three-part *Wilder* test. First, the Court ascertains whether " 'the provision in question was intended to benefit the putative plaintiff.' " *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). Second, even if the provision benefits the plaintiff, it does not create an enforceable right if "it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit." *Id.* (citing *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981)). Third, the

---

**13.** 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Court will not enforce plaintiffs' asserted interest, if it "is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.'" *Id.* (quoting *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 108, 110 S.Ct. at 449; *Wright v. Roanoke Redevelopment and Housing Auth.,* 479 U.S. at 431–32, 107 S.Ct. at 774–75).

As described recently in *Chan v. City of New York,* 803 F.Supp. 710, 721 (S.D.N.Y. 1992), *aff'd,* 1 F.3d 96 (2d Cir.1993), in *Wilder,* the Supreme Court held that the Boren Amendment to the Medicaid Act created a right enforceable by health care providers under § 1983 to obtain "reasonable" reimbursement rates. *Id.* 496 U.S. at 509–10, 110 S.Ct. at 2517–18. The Court reasoned that "[t]here can be little doubt that the health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system of reimbursement of providers and is phrased in terms benefitting health care providers...." *Id.* at 510, 110 S.Ct. at 2517–18. The *Wilder* Court explained that the Boren Amendment "imposes a binding obligation on states participating in the Medicaid program to adopt reasonable and adequate rates" because it "is cast in mandatory rather than precatory terms: The State plan 'must' 'provide for payment ... of hospital[s].'" *Id.* at 512, 110 S.Ct. at 2518–19 (emphasis in original) (quoting 42 U.S.C. § 1396a(a)(13)(A)). "'The Boren Amendment's language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or nudge.'" *Id.* (quoting *West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11, 20 (3d Cir.1989)). Finally, *Wilder* found that the obligation was not "too 'vague and amorphous'" inasmuch as "the statute and regulation set out factors which a state must consider in adopting its rates." *Id.,* 496 U.S. at 519, 110 S.Ct. at 2522.

The *Chan* Court went on to describe the *Suter* case. *Chan,* 1 F.3d at 104. Namely, that several years after deciding *Wilder,* the Supreme Court, in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), established certain guidelines to determine whether a § 1983 right of action exists. *Suter* found that children who were state wards had no right to maintain a § 1983 action to enforce a federal statute that conditioned federal reimbursement for state foster care programs on HHS acceptance of a state plan containing a provision that "'reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home....'" *Suter,* 503 U.S. at 351, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). The Court found that there was no statutory right to maintain a § 1983 action because: (1) "no further statutory guidance is found as to how 'reasonable efforts' are to be measured," *Id.* at 360, 112 S.Ct. at 1368; (2) the method of compliance was, "within broad limits, left up to the state," *Id.;* and (3) the statute provides other enforcement mechanisms and, therefore, the absence of a private remedy under § 1983 did not render the "reasonable efforts" clause ineffectual. *Id.* at 358–62, 112 S.Ct. at 1368–69.

Section 1983 jurisprudence has been described as "in a state of flux." *Chan v. City of New York,* 803 F.Supp. 710, 721 (S.D.N.Y. 1992), *aff'd,* 1 F.3d 96 (2d Cir.1993). In *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court did not overrule *Wilder,* nor did explicitly apply the *Wilder* test. Therefore, as in the Court of Appeals did in *Chan,* this Court will apply the *Wilder* framework, with the modifications and differences suggested by *Suter* to determine whether a right has been created under § 1983. *Chan v. City of New York,* 1 F.3d at 104.

### ii. *Application of the Standards to the Lead Paint Poisoning Prevention Act*

The LPPPA states in pertinent part that HUD:

shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for a mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise

receives more than $5,000 in project based assistance under a Federal Housing program.

42 U.S.C. § 4822.

Under the LPPPA, HUD has promulgated regulations setting forth procedures for lead paint notice, inspection, and elimination for HUD associated housing constructed before 1978. The duties of Public Housing Authorities, receiving federal money are detailed in 24 C.F.R., pt. 35. Several of the programs involving HUD associate housing (including the CDBG program and Section 8 housing) have developed separate regulatory directives to achieve the mandates of the LPPPA, as permitted by the regulations accompanying the Act.

Applying the three-part *Wilder* test, and following the guidelines set out in *Suter*, this Court finds that plaintiffs have an enforceable right under § 1983.

First, children under the age of seven living in housing "covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary of Housing and Urban Development" (the "Secretary,") are the intended beneficiaries of this statute and the accompanying regulations. The CDBG and Section 8 programs are such programs administered by the Secretary.

Second, the statute and the regulations do more than suggest a "congressional preference." Instead, they create a body of mandatory directives to the Secretary or to the public housing authorities. The regulations implementing the enforcement of the LPPPA in both the CDBG and the Section 8 programs meet this second criteria.

**Regulations with Regard to CDBG Program**

▆ 42 U.S.C. § 5301 (the CDBG program) was developed with the following objectives:

... (1) the elimination of slums and blight ... of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income; (2) the elimination of conditions which are detrimental to the health, safety, and public welfare; (3) the consideration and expansion of the Nation's housing stock in order to provide a decent home ...

The regulations implementing the CDBG program, found in 24 C.F.R. § 570.608, *et seq.*, include the duties of grantees (in this case, New York City). In the area of lead-based paint, in non-precatory terms, it is required that:

(3) Inspection and Testing—

(i) Defective paint surfaces. *The grantee shall* inspect for defective paint surfaces in all units constructed prior to 1978 which are occupied by families with children under seven years of age and which are proposed for rehabilitation assistance. The inspection shall occur at the same time the property is being inspected for rehabilitation. Defective paint conditions *will* be included in the work write-up for the remainder of the rehabilitation work.

(ii) Chewable surfaces. *The grantee shall* be required to test the lead content of chewable surfaces if the family residing in a unit, constructed prior to 1978 and receiving rehabilitation assistance, includes a child under seven years of age with an identified EBL condition. Lead content *shall* be tested by using an X-ray fluorescence analyzer (XRF) or other method approved by HUD. Test readings of 1 mg/cm squared or higher using an XRF shall be considered positive for presence of lead-based paint.

(iii) Abatement without testing. In lieu of the procedures set forth in paragraph (c)(3)(ii) of this section, in the case of a residential structure constructed prior to 1978, *the grantee* may forgo testing and abate all applicable surfaces in accordance with the methods set out in 24 C.F.R. 35.24(b)(2)(ii).

(4) Abatement Actions.

(i) For inspections performed under § 570.608(c)(3)(i) and where defective paint surfaces are found, treatment shall be provided to defective areas. *Treatment shall be performed before final inspection and approval of the work.*

... (iii) When weather prohibits repainting exterior surfaces before final inspection, the grantee may permit the owner to abate the defective paint or chewable lead-based paint as required by this section and agree to repaint by a specified date. *A separate inspection is required.*

24 C.F.R. 570.608(c)(3)(i) (emphasis added).

### *Regulations with Regard to Section 8 Program*

In making initial inspections to approve Section 8 housing 24 C.F.R. 882.209 or in making periodic inspections pursuant to 24 C.F.R. 882.211 the PHA *"shall* inspect for defective paint surfaces and shall require treatment as required." 24 C.F.R. § 882.109(i)(3). As in the CDBG program the inspections *must* include inspection for chewable surfaces when children with EBL live in the unit. 24 C.F.R. § 882.109(i)(4). Again the methods of testing and lead content levels requiring action are specified in the regulations.

Before a contract can be executed, the *PHA must certify that the unit is in compliance* with the housing quality standards, including those just described. Specifically, the PHA *shall* inspect the unit for compliance with the standards. 24 C.F.R. § 882.209(h)(1) If there are deficiencies, the PHA *must* advise the owner of the work to be done and before the contract is executed the unit must be reinspected.

The language cited above is evidence of binding obligations on the governmental units addressed by the regulations implementing the LPPPA within the federal housing programs.

Third, plaintiffs asserted interest is not too vague and amorphous that it is beyond the competence of the judiciary to enforce. Unlike in *Suter*, the right plaintiffs seek to claim under is not limited to "reasonable efforts." Plaintiffs seek practice and policies that meet the requirements of the statutes and regulations, thus insuring them safe housing. While the defendants bound by the LPPPA may not have the power to remedy all the lead-based problems that plaintiffs allege they face, they are required to meet their obligations under the law. Plaintiffs allege

that they have failed. Plaintiffs have met the three-part *Wilder* test and have an enforceable right within the meaning of 42 U.S.C. § 1983 to bring a claim to enforce the LPPPA under the CDBG and Section 8.

### b. *Congressional Foreclosure*

### i. *The Existing Framework*

Once it is established that a federal right exists, a § 1983 suit is not available where Congress has expressed its intention to foreclose such a remedy. Yet, courts should not " 'lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.' " *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 520, 110 S.Ct. at 2523 (quoting *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. at 423–24, 107 S.Ct. at 770 (quoting *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984))).

Courts have repeatedly held that defendants have a heavy burden to demonstrate " 'by express provision or other specific evidence from the statute itself' " that Congress intended to foreclose private enforcement. *Wilder,* 496 U.S. at 520–21, 110 S.Ct. at 2523 (quoting *Wright v. Roanoke,* 479 U.S. at 423, 107 S.Ct. at 770). "Other specific evidence" may include the provision of a scheme of remedial devices that is " 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Wilder,* 496 U.S. at 520–21 (quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)). However, "[t]he availability of administrative mechanisms to protect plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that 'allowing a plaintiff' to bring a § 1983 action 'would be inconsistent with Congress' carefully tailored scheme.' " *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 106–07, 110 S.Ct. at 448–49 (citations omitted).

It was recently noted that the "sufficiently comprehensive" test has rarely been met. *Chan v. City of New York,* 803 F.Supp. 710,

726 (S.D.N.Y.1992), *aff'd,* 1 F.3d 96 (2d Cir. 1993).

### ii. *The Existing Framework as Applied to the LPPPA*

 According to the City, plaintiffs are foreclosed from suing under § 1983 because the provision of CDBG, including compliance with the regulations regarding lead paint, may be enforced by the Secretary who has the authority, after an Administrative hearing, to terminate payments or impose financial penalties on the PHA if it fails to company substantially with the procedures of the governing chapter. *See* 42 U.S.C. § 5311(a). There is also a provision for instituting a civil action by the Attorney General against a PHA that "has failed to comply substantially with any provision of this chapter." However, this Attorney General option does not foreclose the private right of action in a Section 1983 action.

> As the Supreme Court noted in *Wilder:* On only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983. In *Sea Clammers [Middlesex County Sewerage Auth. v. National Sea Clammers, Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) ], we held that the comprehensive enforcement scheme found in the Federal Water Pollution Control Act—which granted the EPA considerable enforcement power through use of noncompliance orders, civil suits and criminal penalties, and which included two citizen suit provisions—evidenced a Congressional desire to foreclose private reliance on § 1983.... Similarly in *Smith v. Robinson* [, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) ], we held the elaborate administrative scheme ... [which] included local administrative review and culminated in a right to judicial review ... [to be sufficient].

*Wilder,* 496 U.S. at 521, 110 S.Ct. at 2523–24.

The procedures in § 5311, while they do include court action initiated by the Attorney General, do not preclude direct private action. The statute does not provide a clear mechanism for tenants to bring their complaints to the attention of the Secretary or the Attorney General, as in *Sea Clammers.* The defendants have failed to meet their burden of demonstrating that Congress has foreclosed plaintiffs from bringing a § 1983 action.

Having found a right of action under § 1983, there is no need to determine if a private right of action exists directly under LPPPA. Suffice it to say that other courts considering public housing tenants' rights under the LPPPA have concluded that they may sue to enforce its provisions. *See Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, 524 (E.D.Pa.1992); *Ashton v. Pierce,* 541 F.Supp. 635 (D.D.C.1982), *aff'd,* 716 F.2d 56 (D.C.Cir.1983); *New York City Coalition to End Lead Poisoning v. Koch,* 138 Misc.2d 188, 524 N.Y.S.2d 314 (N.Y.Sup.Ct.1987).

### M. *There is no Claim Under the LPPPA with Regard to Freddie Mac*

 The duties of a building owner of a unit receiving Section 8 funds, as was Freddie Mac in this case, if they are actionable at all under the LPPPA, or implementing regulations of the LPPPA or Section 8, are triggered upon receiving notice by the public housing authority of a defective condition. The plaintiffs have alleged no such notification. When plaintiffs assert a private right of action to enforce alleged violations of a federal statute directly under the statute there must be clear intention of the right intended by Congress and the duty of the proposed defendant must be clear from the language of the federal law. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). In this case, there is no need to perform the analysis required to determine if the cause of action could stand, because it is unrefuted by plaintiffs that defendant owners received no notification from the PHA as is mandated by the regulations.[14] In so far as the claims against Freddie Mac are based on a private right of action under federal statutes they are dismissed.

---

**14.** The same problem lies at any attempt to infer a private right of action under Section 1983. Additional questions of state action would also be raised under Section 1983. Again, we need not address those questions in this case.

In their memorandum in opposition to Freddie Mac's motion to dismiss the claims, plaintiffs allege a right of action as a third party beneficiary of the contract between Freddie Mac as an owner of the dwelling unit receiving Section 8 funds at 1061 St. Nicholas.

Under both federal common law and New York law, a third party may have enforceable rights under a contract if the contract was made for the third party's direct benefit. *See McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233, 248–49 (S.D.N.Y.1989) (citing *Crumady v. The Joachim Hendrik Fisser,* 358 U.S. 423, 428, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959); *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1339 (2d Cir.1974); *Burns Jackson Miller v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983)).

Under Section 8, private landlords enter into Housing Assistance Payments (HAP) contracts with the PHA to receive funds on behalf of their tenants to subsidize the tenants' rent payments. 42 U.S.C. § 1437f(a)–(e). This Court adopts the reasoning and conclusions of the Honorable John M. Walker in *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 248 (S.D.N.Y.1989), with respect to the findings that the tenants are the intended beneficiaries. Citing the Seventh Circuit in *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981), the *McNeill* Court and this Court conclude that "[i]f the tenants are not the primary beneficiaries of a program designed to provide housing assistance payments to low income families, the legitimacy of the multi-million dollar Section 8 program is in grave doubt." *Holbrook,* 643 F.2d at 1261.

Included in the HAP contract is language that requires that "the Owner agrees to maintain and operate the Contract Unit and related facilities to provide Decent, Safe and Sanitary housing in accordance with 24 C.F.R. Section 882.109." Section 4(a) of the HAP Contract between NYCHA and Freddie Mac.

The contract further provides that if the PHA determines that the Owner is not meeting its obligations it may, after a process, terminate or reduce the payments to the owner. As a beneficiary to the contract, plaintiffs here have a right to enforce the terms of the contract.

As far as Section 882.109 pertains to lead paint, however, it requires that the owner receives notification from the PHA that there is an unacceptable lead-paint condition before the owner is obligated to take action. As in the case of plaintiffs' assertion of a private right of action under the LPPPA or Section 1983, the federal cause of action under the federal HAP contract must fail because the obligation of Freddie Mac to correct lead-paint conditions did not accrue in the absence of action by NYCHA.

The motion to dismiss a federal right of action directed against Freddie Mac is granted.

### N. *NYCHA's Motion to Dismiss for Lack of Timely Filing of Notice of Claim is Denied*

Service of a notice of claim is a condition precedent to the commencement of an action against NYCHA. N.Y.Pub.Hous.Law § 157(2) (McKinney's 1989). The time in which a notice must be served upon NYCHA is governed by § 50–e(1)(a) of the General Municipal Law, which states, in pertinent part that the notice of claim shall "be served in accordance with the provisions of this section within ninety days after the claim arises." N.Y.Gen.Mun.Law § 50–e(1)(a) (McKinney 1986). This is required with respect to all claims against NYCHA with the exception of the federal claim.

The Goffin plaintiffs claim that they served a notice of claim on NYCHA on October 11, 1994, 90 days after they had notice that there was lead in their apartment. NYCHA does not dispute these facts in their reply papers. Filing of the notice of claim is a condition precedent to the commencement of an action against NYCHA. *See* N.Y.Gen. Mun.Law § 50–e(1)(a). The Goffins did file the complaint prior to the filing of the notice of claim, but the Court is satisfied that the request for injunctive relief was sufficiently compelling to permit a later filing of the Notice of Claim. *See Dutcher v. Town of Shandaken,* 97 A.D.2d 922, 470 N.Y.S.2d 767

(3d Dep't 1983) (notice of claim not required for action in equity against municipal corporation where demand for money damages is subordinate to requested injunctive relief). Furthermore, because NYCHA had actual notice, in the service of the complaint, it does not appear that it was substantially prejudiced. *See Rechenberger v. Nassau County Medical Center,* 112 A.D.2d 150, 490 N.Y.S.2d 838, 840 (2d Dep't 1985). The New York Court of Appeals pointed out that "actual knowledge of facts . . . makes it unlikely that prejudice will flow from a delay in filing the notice [of claim]." *Beary v. City of Rye,* 44 N.Y.2d 398, 412–14, 406 N.Y.S.2d 9, 377 N.E.2d 453 (1978).

NYCHA's motion to dismiss for failure to file timely notice of claim is denied.

### O. *NYCHA's Motion to Dismiss for Failure to Join and Indispensable Party (HUD) is Denied*

#### 1. *The Legal Standards of Rule 19 Joinder*

Joinder of absent parties under Rule 19, Fed.R.Civ.P., provides in pertinent part:

(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. . . .

*Determination by Court Whenever Joinder not Feasible*

■ If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

■ Rule 19, thus, poses two questions: first, under Rule 19(a), the Court is required to ask whether the proposed party is "necessary" to the action, that is to say, whether the party should be joined if feasible; if the proposed party cannot be joined, then Rule 19(b) is triggered, which poses the question of whether the court could, "in equity and good conscience, proceed in the party's absence." *See 6247 Atlas Corp. v. Marine Insur. Co., Ltd.,* 155 F.R.D. 454 (S.D.N.Y. 1994); *Ente Nazionale Idrocarburi v. Prudential Sec. Group,* 744 F.Supp. 450, 456 (S.D.N.Y.1990). If the Court determines that the case may not proceed in the party's absence, the party is considered "indispensable," and the action should be dismissed.

Under Rule 19(a), the Court must decide if the potential joiners are first, subject to service of process and second, if their joinder will not deprive the court of jurisdiction. However, several courts have ruled that "the concept of indispensability does not concern the Court's subject matter jurisdiction as much as it deals with the ability or right of the Court to make an adjudication[:] The major question is whether the court can render a decision which will not impair the rights of the absent party." *Ente Nazionale Idrocarburi v. Prudential Sec. Group,* 744 F.Supp. at 456 (citing 3A James WM. Moore et al., Moore's Federal Practice ¶ 19.05[2] n. 6 at 19–77); *see also Lipton v. Nature Co.,* 781 F.Supp. 1032, 1034 (S.D.N.Y. 1992) (stating "the Rule 19 motion regarding indispensability of parties . . . [is] addressed to the court's equitable discretion. Necessary and indispensable parties can only be determined

in the context of the particular litigation; the inquiry must be a fact-based one.").

The Supreme Court has summarized the four factors which must be considered pursuant to the Rule 19(b) in determining whether a litigation may proceed in the absence of an indispensable party as follows: (1) whether the party sought to be joined has an interest in having a forum and whether an adequate alternate forum exists; (2) the interest of the party seeking joinder in avoiding "multiple litigation, or inconsistent relief, or sole responsibility for a liability that he shares with another;" (3) "the interest of the outsider whom it would have been desirable to join;" (4) "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109–11, 88 S.Ct. 733, 737–39, 19 L.Ed.2d 936 (1968); see also *Klockner Stadler Hurter, Ltd. v. Insurance Co. of Pennsylvania*, 785 F.Supp. 1130, 1133 (S.D.N.Y. 1990) (discussing *Provident Tradesmens* analysis of Rule 19(b)'s four factors); *Ente Nazionale Idrocarburi v. Prudential Sec. Group*, 744 F.Supp. 450, 458–62 (S.D.N.Y. 1990) (same).

### 2. *HUD is Not a Necessary Party and Joinder is Not Required*

■ NYCHA concedes that HUD could be joined as a party. There are not problems of jurisdiction over the agency nor would the joinder destroy subject matter jurisdiction; the case is one with jurisdiction based, in part, on federal questions.

The Court does not agree that the relief sought would necessarily require HUD to modify its policies. The complaint asserts that NYCHA has not met its obligations under the LPPPA. It is not obvious that requiring it to meet those obligations would necessitate modifications of HUD's policies.

NYCHA provided the Court with no concrete examples of which HUD policies would require modification. The motion to dismiss this case on this ground or to require the joinder of HUD is denied at this time.

Furthermore, NYCHA can only be obligated through this litigation to perform its statutory and regulatory duty as defined in the applicable statutes. NYCHA is not an owner in this action and therefore can only be liable to the plaintiffs for violations of statutes that apply to it as a public housing authority that administers federal money to New York City housing. The remedy fashioned, as it applies to any claims against NYCHA that plaintiffs prove, must conform to the authority of the defendants.

### P. *Freddie Mac's Additional Partial Summary Judgment Motions are Denied*

Freddie Mac moves for summary judgment with respect to the equitable relief sought by the Goffin and German plaintiffs. Some of the grounds for this motion have been discussed above. The remaining issue is one of notice. As discussed above, the Germans do not have standing to seek injunctive relief against Freddie Mac, Tebec or CAISI.

■ Plaintiffs allege that Freddie Mac received notice of "immediately hazardous violations" at the Montgomery Avenue Building and that Freddie Mac and the City of New York were parties to a Consent Agreement of February 20, 1991, which included notice of lead paint violations. Plaintiffs allege that the City also served a notice of Class C immediately hazardous violations for lead paint in Apartment 2–H, the German's apartment, on June 9, 1992. Plaintiffs allege that the violations were never abated. While it is true that Freddie Mac was not the owner of the Montgomery Avenue property after September, 1992, this does not foreclose the German plaintiffs from seeking damages against it. The exposure to "hazardous" conditions, alleged by plaintiffs, and the subsequent elevated lead levels reported for the German children only 16 days after Freddie Mac ceased to own the building, in light of the debate between the experts found on this record, precludes a finding of summary judgment on the issues of damages with respect to the Freddie Mac defendants.

Freddie Mac also moves for summary judgment to dismiss the Goffins' claims for equitable relief. There are material issues of fact in dispute that preclude the granting of summary judgment at this time. These is-

sues involve the existence of chipping and peeling paint in the Goffin home and the presence of dangerous, unacceptable levels of lead. The Goffins allege that they notified the superintendent of the building of plaster falling out of holes in the walls of the living room and the bedroom as early as April of 1994. At that time Freddie Mac defendants still owned and managed the building. In addition, there is a dispute in the record about the level of "local damage" in the painted surfaces of the apartments. While the proof of the claims remains for a later day, the allegations are sufficiently supported and raise serious enough questions of disputed fact to foreclose the appropriateness of summary judgment with regard to equitable relief on these facts.

As far as notice from the Goffins to Freddie Mac is concerned, there are allegations that the Goffins notified the superintendent of chipping paint, that the work done by Freddie Mac's agent, Torres, to repair extensive damage and his failure to certify on the Section 8 form that no lead paint violations existed, and the complaints of the Goffins themselves provided sufficient notice of lead paint hazards in their apartment. Again, a granting of summary judgment at this juncture would be premature.

### Q. *Pleadings*

Finally let it be known that plaintiffs agreed to modify their second amended complaint to eliminate the redundancies in the pleadings.

### *Conclusion*

Additional class representatives should be appointed for the additional sub-classes herein defined.

For the reasons stated above, the plaintiffs' motion is granted as modified and the defendants' motions are granted in part and denied in part.

It is so ordered.